661 So.2d 1333 (1995)
STATE of Louisiana
v.
George BROOKS.
No. 94-KK-2438.
Supreme Court of Louisiana.
October 16, 1995.
Dissenting Opinion October 27, 1995.
*1334 Richard P. Ieyoub, Attorney General, Duncan S. Kemp, III, District Attorney, Cassandra Butler, Independence, Daniel H. Edwards, Amite, for Applicant.
Anthony M. Bertucci, Robert M. Grodner, Baton Rouge, for Respondent.
Dissenting Opinion of Justice Lemmon, October 27, 1995.

ON REHEARING
MARCUS, Justice[*].
George Brooks was indicted by the grand jury for the 1979 first degree murder of Joseph Cook Owen, an eleven year old boy. Defendant was tried by jury in 1980, and found guilty as charged. After a sentencing hearing, the jury recommended the death sentence. After defendant's appeal was lodged in this court, we granted defendant's motion to remand the case to the district court for a hearing on a motion for new trial on newly discovered evidence.[1] 407 So.2d 718 (La.1981). On remand, the trial judge granted a new trial. Defendant was re-tried in 1985, and the jury found him guilty as charged. After a sentencing hearing, the jury recommended the death sentence. The trial judge sentenced defendant to death in accordance with the recommendations of the *1335 jury. This court affirmed defendant's conviction and sentence. 505 So.2d 714 (La.1987).
In 1989, defendant filed a petition for stay of execution and post conviction relief, raising the issue of ineffective assistance of counsel. The trial judge denied relief. Upon defendant's application, we granted writs, stayed his execution and ordered the trial judge to "conduct an evidentiary hearing on all aspects of the allegations of ineffective assistance of counsel." 547 So.2d 369 (La. 1989). After an evidentiary hearing, the trial judge denied the motion for new trial as to the guilt phase, but vacated defendant's sentence and granted a new trial on the penalty phase, based on the fact that defendant's attorney during the penalty phase, who had been admitted to the bar for less than five years at the time of the trial, "was not qualified by experience to act as lead counsel" under La.Code Crim.P. art. 512.[2] The state applied to the court of appeal for supervisory writs, which were denied without comment.
Upon the state's application to this court, we granted writs and reversed the judgment of the trial court, finding that the mere fact the penalty phase of defendant's trial was conducted by an assistant counsel with less than five years experience did not automatically invalidate the penalty imposed upon defendant.[3] Upon defendant's application, we granted rehearing, notifying counsel we were particularly interested in the issues of alleged ineffective assistance of counsel in both the guilt and penalty phases.[4]
The sole issue before us is whether defendant received ineffective assistance of counsel in either the guilt or penalty phases of his trial.
On July 7, 1979, the body of a small boy was found in a remote area of Livingston Parish. After identifying the victim as eleven year old Joseph Cook Owen, police canvassed the victim's neighborhood seeking information about the child's disappearance. Defendant was not at home at the time, but police questioned his homosexual lover, James Copeland, who occupied the residence with defendant. Copeland was the only person in the neighborhood who reported to the police that he had seen the victim on the preceding evening. Copeland accompanied the officers to the police station for questioning. While Copeland was at the station, defendant returned to the residence and agreed to accompany the officers to the police station. After Copeland made a statement implicating himself and Brooks in the sexual assault and murder of the victim, defendant was arrested.[5] Defendant subsequently made an inculpatory statement to the Livingston Parish Sheriff's Office investigators.[6]
*1336 In December, 1984, Daniel Schmidt was appointed as counsel for defendant and Gary Peltier was appointed as co-counsel.[7] At the time, Schmidt had been admitted to the bar for nearly ten years; Peltier had been admitted for approximately two years. Schmidt interviewed defendant for approximately half an hour and both he and Peltier reviewed the transcript from the previous trial. At the arraignment on January 10, 1985, Schmidt entered pleas of not guilty and not guilty by reason of insanity on defendant's behalf. The insanity plea was subsequently withdrawn. On May 6, 1985, Schmidt appeared on defendant's behalf at a hearing on a motion to suppress defendant's confession. That motion was denied by the trial judge.
Trial commenced on October 7, 1985. On the morning of trial, Schmidt filed a motion to quash the indictment based on violation of speedy trial rights. The trial judge denied the motion and jury selection commenced. Schmidt successfully challenged twelve jurors for cause and used all his peremptory challenges.
During his opening statement, Schmidt admitted that defendant was present at the scene, but contended there was no evidence that defendant committed aggravated rape or aggravated kidnapping, or that he shot the victim. Schmidt told the jury there was "no reason" for him to cross-examine the state witnesses because he admitted that defendant was at the scene. In its case in chief, the state presented the testimony of the victim's mother, the person who found the body, the detectives who investigated the crime, a forensic scientist and the doctor who performed the autopsy on the victim's body. Among the exhibits submitted by the state were the shotgun and shells, the victim's blue jeans, and the tape and transcript of defendant's statement to police. Schmidt presented two witnesses on behalf of the defense: defendant and his mother. Schmidt did not participate in the penalty phase, which was handled by Peltier. Peltier presented no witnesses at the penalty phase, and simply made a brief opening and closing argument.
At the post conviction evidentiary hearing, defendant presented the testimony of Schmidt and Peltier. Schmidt, who was disbarred in 1987,[8] testified that at the time of defendant's trial, he was drinking and using cocaine. He testified that he only met with defendant for a half an hour before trial, although he reviewed the previous trial transcript. He stated that during jury deliberations at the conclusion of the guilt phase, he went to his apartment and snorted approximately a half to one gram of cocaine and drank some alcohol. After returning to court, he told Peltier to take over the penalty phase. Peltier testified that he had met with Schmidt in preparation for defendant's trial, and reviewed the transcript of the first trial. He talked to defendant on the day of trial. Peltier stated that he did not know he would handle the penalty phase by himself until Schmidt returned to court, but that he felt he was "pretty much ready" to do so.
Defendant also presented the testimony of Dr. Mark Zimmerman, an expert in forensic psychology, and Dr. Louis Cenac, an expert in general adult psychiatry. Based on his review of defendant's medical records and his examination of defendant, Dr. Zimmerman believed defendant was suffering from borderline personality disorder. Dr. Zimmerman testified, based on records from 1978, that Copeland had "control" over defendant. Dr. Cenac gave basically the same diagnosis as Dr. Zimmerman, concluding that it was "clear" that defendant was dominated by Copeland. Neither of the doctors testified that defendant had a viable insanity defense, only that such a defense should have been "explored."
*1337 Finally, defendant presented the testimony of Michele Fournet and James Boren, both experts in the preparation and defense of death penalty cases. Ms. Fournet characterized the penalty phase as "grossly inadequate." She testified that the failure of defendant's trial counsel to contact and interview family members and friends and the failure to obtain and use defendant's medical records at the penalty phase amounted to ineffective assistance of counsel. Mr. Boren expressed similar opinions.

Ineffective Assistance at the Guilt Phase
A defendant in a criminal proceeding is entitled to effective assistance of counsel. U.S. Const.Amend. VI; Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Under Strickland, a convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.
In our opinion on appeal in this case, 505 So.2d at 724, we addressed the question of whether Schmidt's "no question defense" constituted ineffective assistance of counsel:
The record indicates that the decision to employ a "no question defense" was a deliberate one. It appears to be more a product of trial strategy than the result of poor preparation or incompetent representation. The strategy was no doubt designed to rob the state of the force of its evidence. By conceding defendant's presence throughout, defense counsel could focus juror attention on the few facts that weighed in defendant's favor, i.e. that the state could not, through its physical evidence, place defendant's hand on the trigger or show conclusively that he also raped the victim. In this way, counsel sought to distance his client from the aggravated rape as well as the actual killing and thus influence the jurors toward leniency in the selection of the punishment.
While we are not bound in this post conviction proceeding by our earlier findings, nothing in the present record seems to require a different result. Schmidt's testimony at the post conviction evidentiary hearing (given some six years after the trial) indicates his pre-trial preparation was limited. Nonetheless, Schmidt testified that he reviewed the transcript of the first trial, which would have given him a virtual preview of the case the state would put on.[9] Armed with this knowledge, and faced with defendant's confession admitting he was at the scene, it was not unreasonable for Schmidt to adopt a "no question defense," in the hope the jury would focus on the inability of the state to show defendant was the triggerman or committed the rape. Clearly, defendant has not shown that Schmidt's decision to adopt such a strategy was an error so serious that he was not functioning as the "counsel" guaranteed by the Sixth Amendment. Therefore, we conclude that defendant has failed to show he received ineffective assistance of counsel at the guilt phase.[10]

Ineffective Assistance at the Penalty Phase
A defendant at the penalty phase of a capital trial is entitled to the assistance of reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Sanders, 93-0001 (La. 11/30/94); 648 So.2d 1272, 1291; State v. Myles, 389 So.2d 12, 28 (La.1980) (on rehearing). In evaluating *1338 a claim of ineffective assistance of counsel during the penalty phase of a capital case, we must first determine whether a reasonable investigation would have uncovered mitigating evidence. If such evidence could have been found, we must consider whether counsel had a tactical reason for failing to put the evidence before the jury. If the failure to present mitigating evidence was not a tactical decision but reflects failure by counsel to adequately advocate his client's cause, defendant must still have suffered actual prejudice due to the ineffectiveness of his counsel before relief will be granted. State ex rel. Busby v. Butler, 538 So.2d 164, 169 (La. 1988).
Defendant argues that his trial counsel erred in failing to present evidence showing that he was under the domination of Copeland at the time of the murder, which would be a mitigating circumstance under La.Code Crim.P. art. 905.5(c).[11] In support, defendant produced medical records from 1978 (approximately one year before the murder) showing he sought emergency treatment at the Margaret Dumas Mental Health Center complaining of severe depression when Copeland threatened to leave him. The records indicate that defendant stated if Copeland did not return "life is not worth living." At the post conviction hearing, defendant produced the expert testimony of Dr. Zimmerman and Dr. Cenac, both of whom testified it appeared from the medical records that defendant was under Copeland's domination or control. Defendant also produced the expert testimony of Ms. Fournet, who testified she interviewed defendant's sister, who told her defendant's relation with Copeland was one of "emotional bondage."
In addition to the domination evidence, defendant presented medical records dating back to 1959 showing he had a history of mental problems, and was taking the prescription antidepressant Sinequan at the time of the murder. Defendant argues this evidence could have been used as a mitigating circumstance under La.Code Crim.P. art. 905.5(e).[12]
There is little doubt that a reasonable investigation by defendant's counsel easily would have uncovered this mitigating evidence. Schmidt's own testimony at the post conviction hearing revealed that he obtained medical releases from defendant, but never used those releases.
Since it is clear that defendant's counsel failed to uncover relevant mitigating evidence, we next address whether there was a tactical reason for his failure to do so. As stated by the Supreme Court, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Burger v. Kemp, 483 U.S. 776, 794, 107 S.Ct. 3114, 3125, 97 L.Ed.2d 638 (1987) (citing Strickland, 466 U.S. at 690-691, 104 S.Ct. at 2065-66). In Kemp, the Court found the attorney interviewed all potential witnesses called to his attention and made a strategic decision that an explanation of the defendant's history would not have minimized the risk of the death penalty. Based on this decision, the Court concluded that he need not undertake further investigation to locate witnesses who would make statements about defendant's past. By contrast, in the instant case, defendant's counsel made no effort to obtain any medical records or interview any witnesses concerning defendant's relation with Copeland or his mental health history. Under these circumstances, it is impossible to say that defendant's counsel made a reasonable strategic decision not to make a complete investigation. As we stated in Busby, 538 So.2d at 171, "while the failure to present mitigating evidence at trial can be reasonable if shown to be the result of tactical decision, the failure to investigate the existence of *1339 such evidence is ineffective assistance of counsel." (emphasis in original).
Having concluded that the assistance provided by defendant's counsel at the penalty phase was ineffective, we still must determine whether the deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair, resulting in prejudice to the defendant. Lockhart v. Fretwell, 506 U.S. 364, ____, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). The state argues that defendant suffered no prejudice from the lack of evidence, since Peltier argued the existence of domination as a mitigating circumstance during the penalty phase, but the jury chose to reject this factor.
We find no merit to the state's position. A review of Peltier's argument shows his presentation of the mitigating circumstance of domination was hardly forceful, since at one point, he conceded defendant was not dominated by Copeland.[13] Clearly, Peltier's argument would have been bolstered considerably if he had established a foundation of expert testimony. Likewise, expert testimony on defendant's history of mental problems, while not rising to the level necessary for an insanity defense, may have provided additional mitigating evidence for the jury's consideration. Therefore, we hold the failure of defendant's counsel to present any mitigating evidence prejudiced the defense.
Additionally, the record demonstrates there was a clear absence of preparation at the penalty phase. Both Schmidt and Peltier testified at the post conviction hearing that Peltier was not informed he would handle the penalty phase alone until immediately prior to the beginning of the penalty phase. Although Peltier testified he felt "pretty much ready" to handle the penalty phase, his performance at the penalty phase indicates this was not the case. After the state made its opening argument, Peltier presented his argument. The state then introduced by reference the evidence it presented during the guilt phase, and Schmidt and Peltier, with some prodding from the trial judge, did the same. Thereafter, the state made its closing argument. In response, Peltier made a brief argument (consisting of only five sentences),[14] in which he contended that defendant did not intend to shoot the victim, since he untied and ungagged him. Reviewing this performance, it is difficult to conclude that Peltier acted as a "diligent, conscientious advocate" for defendant's life, as contemplated by State v. Myles, 389 So.2d at 30.
Taking all these factors together, we conclude that the deficient performance of defendant's counsel rendered the result of the penalty phase unreliable, resulting in prejudice to the defendant. Accordingly, we must set aside defendant's sentence and remand the case to the trial court for a new sentencing hearing.

DECREE
For the reasons assigned, the judgment of the district court denying a new trial on the guilt phase of defendant's trial is affirmed. The judgment of the district court vacating his sentence and ordering a retrial of the penalty phase is affirmed on different grounds. The case is remanded to the district court for further proceedings.
LEMMON, J., dissents and assigns reasons.
*1340 LEMMON, Justice, dissenting.
While this is a close case of ineffective assistance of counsel in the penalty phase, the jury was fully aware of the most substantial mitigating circumstancesdefendant was not the triggerman; defendant was substantially influenced in his conduct by his dominant homosexual lover; there was no evidence defendant raped the victim; and defendant untied and ungagged the victim.
Although these factors could have been argued more forcefully, I cannot say that defendant met his burden of proving that any proved ineffectiveness of counsel made the result of the penalty phase unreliable.
NOTES
[*] Judge Ned E. Doucet, Jr., Court of Appeal, Third Circuit, sitting by assignment in place of Justice James L. Dennis. Calogero, C.J. not on panel. Rule IV, Part 2, § 3.
[1] The evidence concerned violations of the rule of sequestration, which were similar to those detailed in State v. Copeland, 419 So.2d 899 (La.1982).
[2] La.Code Crim.P. art. 512 provides in pertinent part: "Counsel assigned in a capital case must have been admitted to the bar for at least five years. An attorney with less experience may be assigned as assistant counsel."
[3] 94-2438 (La. 12/19/94); 647 So.2d 339.
[4] 94-2438 (La. 3/24/95); 651 So.2d 300.
[5] Copeland's first statement indicated that defendant shot the victim, but in a second statement, he told police he killed the victim. Copeland was subsequently found guilty of first degree murder and sentenced to death. His conviction and sentence were affirmed by this court. State v. Copeland, 530 So.2d 526 (La.1988).
[6] The statement was summarized in our previous opinion, 505 So.2d at 716, as follows:

Early in the preceding week, Brooks and Copeland had discussed finding a third person with whom they both could have sex. After work on Friday, July 6, Brooks went out searching in his car, leaving Copeland at the house. Brooks called home several times during the evening. During the last call, Copeland said that he had company and that Brooks should come home. When Brooks arrived home, Copeland and an eleven year old boy, Joseph Cook Owen, were in the bedroom drinking beer and smoking cigarettes.
At Copeland's suggestion, Brooks held Owen's arms, then tied him up. Copeland had anal and oral sex with Owen; Brooks also had the boy perform an act of fellatio upon him. Afterward, Owen went into the bathroom and vomited. He sat and waited, asking the men what they were going to do with him. According to Brooks, Copeland told the boy that they were going to drop him off at some distance so that it take him a long time to get back home.
Owen, who was gagged with an orange cloth and whose hands were tied, was taken to the car. Copeland took his gloves and his shotgun, using the gun to threaten Owen. Brooks drove the car to an area called Magnolia Beach in Livingston Parish. The men walked Owen to a clearing in the woods, where they untied and ungagged him and told him to sit down. While Brooks was walking toward the car, he heard a shot, looked back, and saw Copeland reload and shoot twice more.
The men ran toward the car, leaving the gun at the scene. It was stolen and thus not likely to be traced to them. They drove away, then stopped at a convenience store for a beer and coffee. After leaving the store. Brooks threw the rope and gag out of the car. They arrived home at 3 or 4 a.m. on Saturday.
[7] Schmidt and Peltier did not represent defendant at his first trial in 1980; at that time, defendant was represented by Timothy Higgins.
[8] Louisiana State Bar Ass'n v. Schmidt, 506 So.2d 1186 (La.1987); Louisiana State Bar Ass'n v. Schmidt, 539 So.2d 622 (La.1989).
[9] With one exception, the state called the same witnesses in the 1985 trial that it called in the 1980 trial.
[10] Defendant has suggested that Schmidt's representation was so deficient as to justify a presumption of ineffectiveness under United States v. Cronic, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984). We find no merit to this argument. Cronic focuses on the unreliability of the adversarial process itself, not on the accused's relationship with his lawyer. See State v. Lowenfield, 495 So.2d 1245, 1253 n. 7 (La.1985), cert. denied, 476 U.S. 1153, 106 S.Ct. 2259, 90 L.Ed.2d 704 (1986).
[11] La.Code Crim.P. art. 905.5(c) provides:

The following shall be considered mitigating circumstances:
(c) The offense was committed while the offender was under the influence or under the domination of another person.
[12] La.Code Crim.P. art. 905.5(e) provides:

The following shall be considered mitigating circumstances:
(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication.
[13] In his argument, Peltier stated:

A third factor which goes along with that: the offense was committed while the offender was under the influence or under the domination of another person. We all have our free will, but we are all influenced by some one whether it be our parents, our husband, our wife, or our children. We are influenced by what we do at all times. We are not free independent all the time. When we make a decision, we consider who we are affecting. We don't look out for number one all the time. I am not saying that he was dominated by James Copeland, but I am saying that he was influenced by him.... (emphasis added).
[14] This argument is labeled in the transcript as "closing argument by the defense." However, at the post conviction hearing, Peltier testified that since no new evidence was introduced at the penalty phase, he did not believe he had to make a separate opening and closing argument and instead intended to make a combined opening and closing argument.