699 So.2d 29 (1997)
STATE of Louisiana
v.
William G. HAMILTON.
No. 92-KA-2639.
Supreme Court of Louisiana.
July 1, 1997.
Rehearing Denied September 5, 1997.
*30 James Earl Calhoun, Clive Adrian Stafford Smith, R. Neal Walker, New Orleans, for Applicant.
Richard P. Ieyoub, Atty. Gen., Van H. Kyzer, Dist. Atty., for State.
MARCUS, Justice.[*]
William G. Hamilton was indicted for the first degree murder of Versey Roberts in violation of La. R.S. 14:30. After trial by jury, defendant was found guilty as charged. A sentencing hearing was conducted before the same jury that determined the issue of guilt. The jury unanimously recommended that a sentence of death be imposed on defendant. The trial judge sentenced defendant to death in accordance with the recommendations of the jury.

FACTS
In the early afternoon of August 23, 1991, Versey Roberts, a sixty-eight year old white male, was found shot three times in the head at his place of business, a lumber mill, on Post Mill Road outside of Natchitoches, Louisiana. Although the mill was closed that day, the victim and his grandson-in-law, Brian Olliff, were working in the office. Roberts left the office to go into the mill yard. Shortly thereafter, Olliff heard a truck and when he looked out of his office window, he saw Roberts' truck pass by driven by a black male. He went out to investigate because it was unusual for Roberts to allow someone else to drive his truck and discovered Roberts' body in the mill yard. Olliff immediately called the police and a number of units were dispatched to the scene. Two deputies on the way to the scene recognized Roberts' truck as it passed them on the highway headed toward Natchitoches. They turned around and pursued the vehicle. When the driver of the truck tried to evade the police vehicle, one of the deputies shot out one of the truck's tires and the truck drove into a ditch. The driver took off on foot but was soon apprehended by the deputies. Defendant, a thirty-two year old black male, was identified as the driver of the truck and was placed under arrest. One of the officers found Roberts' wallet containing $860 in cash in one of defendant's rear pockets. A black rubber glove, the same as those used at the lumber mill, was found in the other rear pocket. No weapon was found on defendant and no weapon was ever recovered.
Olliff testified that defendant had previously worked for Roberts for several months but had quit about three weeks earlier when defendant asked Roberts to loan him about five or six hundred dollars and he refused. Earlier on the day of the murder, a witness who lived in the area saw defendant standing at a fence row on the backside of the millyard. He recognized defendant as the same person that he saw cleaning the fence row a few weeks earlier. A footprint found at the scene matched that of the shoe that defendant was wearing.
Defendant was read his Miranda rights at the scene and again at the police station. When asked by the deputies if he had shot the victim, defendant responded that "an old man and an old woman told him to hurt people." He also told them that an old man and old woman gave him the gun and the wallet.
About two days later, while still in custody, defendant was questioned once again. This time he told the deputies that on the day of the murder, he was walking along the road when he saw Roberts' truck at Emmanuel Baptist Church on Highway 6 and the motor was running with no one inside. He got into the truck and began driving towards Natchitoches. He found the wallet on the floorboard of the truck and picked it up and put it in his pocket.
Defendant pled not guilty and not guilty by reason of insanity. James Calhoun was appointed as counsel for defendant. A sanity commission was appointed upon the request of defense counsel. After a hearing, the trial judge determined that defendant had the mental capacity to understand the proceedings against him and the ability to assist in his own defense.
Trial commenced on January 29, 1992, about five months after indictment. The *31 prosecution presented various deputies and witnesses who testified to the facts set forth above. Two members of the sanity commission testified. Dr. Paul Ware testified that defendant possessed symptoms consistent with paranoid schizophrenia. Defendant told Dr. Ware that he heard voices and someone told him to take the truck and the wallet and drive away. Dr. Ware concluded that defendant was legally sane at the time of the commission of the crime. Dr. Boswell agreed with Dr. Ware that defendant was suffering from a psychotic illness. She testified that defendant told her that he heard voices and people told him to do bad things. She concluded that defendant knew the difference between right and wrong and that he was legally sane at the time the offense occurred.
Defense counsel made a brief opening statement in which he told the jury that the only issue before them was that of punishment. Defense counsel called two witnesses. First, he called a nurse from the sheriff's office who testified that defendant was placed on various medications shortly after he was taken into custody and that he has been under the care of the Natchitoches Mental Health Clinic since that time. Next, he called defendant's mother who testified that for most of his life, defendant had mental and behavioral problems and was on medication. During the several months he lived with her prior to the murder, he took five pills a day which had been administered by the health clinic. Defendant took the stand and related his version of the events on the day of the murder. He testified that he took a walk on Highway 6 and found a truck that was already running and he got in and found a wallet in the truck and drove off. He admitted that on the day he quit work, he had asked Roberts for $300 for another car because his had broken down. He further testified that he knew Roberts "toted money on him." The prosecution then introduced evidence of a prior conviction for simple robbery in Natchitoches Parish in 1977 and a conviction for robbery with a dangerous weapon in 1981 in Texas for which he was incarcerated from 1982 until May of 1990. The prosecutor and defense counsel gave closing arguments. The jury returned a verdict of guilty as charged.
At the penalty phase, defense counsel made no opening statement and put on no evidence or witnesses. When the trial judge asked if he wished to offer the testimony given earlier, defense counsel replied affirmatively. He made a two paragraph closing argument. The state presented four witnesses who testified to defendant's previous conviction for armed robbery in Texas. After deliberation, the jury returned a sentence of death.

ISSUES
Defendant's appellate counsel[1] argues fifteen assignments of error for reversal of his conviction and sentence. His primary argument is that defendant received ineffective assistance of counsel at both the guilt phase and the sentencing phase of his trial.[2] A claim for ineffective assistance of counsel is generally raised in an application for postconviction relief. Post-conviction proceedings enable the district judge to conduct a full evidentiary hearing on the matter. See State v. Seiss, 428 So.2d 444, 449 (La.1983). We think that defendant's claim of ineffective assistance of counsel at the guilt phase of trial is best addressed in post-conviction relief proceedings where the trial judge can conduct a full evidentiary hearing on the issues relating to counsel competency. However, we find the record contains sufficient evidence to decide the issue of ineffective assistance of counsel at the penalty phase, and we will do so in the interests of judicial economy. See State v. Ratcliff, 416 So.2d 528, 530 (La.1982). Finding merit in this issue, for reasons hereinafter set forth, we will vacate defendant's sentence of death and remand for a new sentencing hearing. We have reviewed the remaining assignments of error and finding no merit to them, we will affirm his conviction. The assignments of error will be treated in an appendix which *32 will not be published but will comprise part of the record of this case.

INEFFECTIVE ASSISTANCE OF COUNSEL AT THE PENALTY PHASE
Defendant contends that his counsel's performance at the sentencing phase of his trial was constitutionally ineffective and of such an egregious nature that his sentence should be overturned. In particular, he argues that his counsel made no opening statement, called no witnesses and presented a two paragraph closing argument in which he failed to discuss mitigating circumstances relevant to defendant's mental impairment.[3]
The record reflects that in the penalty phase, the prosecutor made an opening statement in which he argued that the death penalty was appropriate because of two aggravating circumstancesthe offender was engaged in the perpetration of an armed robbery at the time of the murder and defendant had a previous conviction for an unrelated armed robbery. Defense counsel declined to make an opening statement. The state presented four witnesses who testified and presented evidence about defendant's prior armed robbery conviction. Defense counsel did not put on any evidence. The trial judge asked defense counsel if he wished to offer the testimony given earlier. Defense counsel answered "yes." The state gave a closing argument and defense counsel made the following closing argument:
May it please the Court. Ladies and gentlemen of the jury, Mr. Henry [district attorney] has suggested that you should have your minds made up about the penalty. If you do then I will have failed miserably in the jury selection process. Each of you promised me that you would deliberate and consider again in determining a penalty if the trial went into that phase. I now ask each of you to honor that promise.
William Hamilton has a long history of mental illness, all of his life he's been sick. Three years in a Texas insane asylum. Two doctors who testified that he is a schizophrenic. He's certainly laboring under a serious, serious disease. The District Attorney has pointed out his past transgressions. He has suggested that vengeance is a reason for imposing a death penalty. But to whom does vengeance belong?
Thank you.
A defendant at the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Brooks, 94-2438 (La.10/16/95); 661 So.2d 1333, 1337; State v. Sanders, 93-0001 (La.11/30/94); 648 So.2d 1272, 1291, cert denied, ___ U.S. _____, 116 S.Ct. 2504, 135 L.Ed.2d 194 (1996). When a defendant challenges the effectiveness of his counsel at the penalty phase, the court must determine whether there is a reasonable probability that, absent counsel's errors, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death. Sanders, 93-0001 at p. 25; 648 So.2d at 1291. In evaluating a claim of ineffective assistance of counsel during the penalty phase of a capital case, we must first determine whether a reasonable investigation would have uncovered mitigating evidence. If such evidence existed, then we must consider whether counsel had a tactical reason for failing to put the evidence before the jury. If the failure to present mitigating evidence was not a tactical decision but reflects failure by counsel to adequately advocate for his client's cause, defendant must still have suffered actual prejudice before relief will be granted. Brooks, 94-2438 at pp. 7-8; 661 So.2d at 1337-38; State v. Sullivan, 596 So.2d 177, 190-191 (La.1992), rev'd on other grounds, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (La.1993).[4]
*33 The issue presented is whether defense counsel failed to investigate and evaluate the claim that defendant is suffering from a serious mental disease, a factor which the jury could have considered in mitigation in the sentencing phase of trial.[5] If defense counsel failed to present such evidence, we must then determine whether it was a tactical decision or incompetency on the part of defense counsel. Last, we must decide if defendant suffered prejudice as a result.
An investigation by defendant's appellate counsel revealed that defendant was treated at Rusk State Mental Hospital in Texas during a period of his incarceration in Texas from August of 1989 until May of 1990. The psychiatric evaluation performed upon admission to Rusk states that defendant was preoccupied with thoughts of hurting others, was increasingly irritable, he often heard voices calling his name and he was generally functioning at a disturbed level. He was diagnosed as suffering from acute schizophrenic disorder. He was started on psychotropic medication but did not respond well to the medication and continued to function at a disturbed level. He exhibited the urge to assault almost anyone, who in the course of a day, irritated or thwarted him. The Discharge/Release Summary from the Texas Dept. of Corrections dated May 1, 1990, documents defendant as suffering from chronic undifferentiated schizophrenia but notes that defendant appears to be in remission due to medication. The report recommends that defendant continue taking medication and seek regular psychiatric clinic consults for medication evaluation.
After he was released on parole from the Texas Department of Corrections in May of 1990, he returned to Natchitoches and was seen on a regular basis at the Natchitoches Mental Health Center from early May until late April 1991, a few months prior to the murder. The medical records obtained by appellate counsel from the health center diagnose defendant as suffering from chronic undifferentiated schizophrenia. These records further note that defendant complained of auditory and visual hallucinations involving a man and woman. For eight months, defendant visited the clinic about every two weeks for counseling and medication management of anti-psychotic drugs. The entry in November of 1990 states that defendant is "still seeing man and womanmore frequently like 2x's a day.... Will consider psychiatric hospitalization if further decompensation." The record reveals that defendant's last visit to the clinic was in April of 1991.
We conclude that a reasonable investigation would have uncovered this mitigating evidence which could have been used to support defense counsel's theory that defendant was suffering from a mental disease or defect. These records would show that defendant had suffered from auditory and visual hallucinations for some time, particularly that a man and woman would appear and tell him to do bad things. The information contained in the reports would corroborate the statements that defendant made to the deputies when arrested and as well as defendant's testimony during the guilt phase at trial.[6] While this additional evidence may not have been sufficient to convince the jury during the guilt phase of trial that defendant was legally insane, that is, that he was unable to distinguish right from wrong at the time he committed the offense, nevertheless, we think the evidence supports the presentation of mitigating circumstances of mental disease or defect in the penalty phase of trial. Moreover, *34 defense counsel pursued no other avenues in preparation for the penalty phase. One sanity commission member, Dr. Boswell, recommended a full neurological examination of defendant. This was never done. Defense counsel did not bring defendant's mother or other family members to testify at the penalty phase to elaborate on defendant's history of mental problems or to make a plea for a life sentence.
We must next determine whether there was a tactical reason for counsel's failure to present any of this relevant evidence. Our review of the record convinces us that this was not a tactical choice but a result based on incompetency. Defense counsel's strategy was to prove that defendant was not guilty by reason of insanity, but, in any event, that he only deserved life imprisonment, not the death penalty. In his opening statement defense counsel argued that the jury should find defendant not guilty by reason of insanity, but if it did not, imprisonment would be a proper sentence in view of his serious mental disease. He presented a nurse and defendant's mother. His mother testified to defendant's past history of mental disease and the nurse testified to defendant's need for treatment after the offense. Defense counsel put defendant on the stand to reaffirm the statement made to the deputies upon his arrest that "an old man and woman made me do it." We cannot find that defense counsel made a reasonable strategic decision not to investigate and present the mental health records from both the Texas hospital and the Natchitoches Mental Health Center. Such evidence would not only have bolstered the insanity defense in the guilt phase, but most certainly would have contributed to circumstances in mitigation in the penalty phase. Rather, we think it was counsel's incompetent performance that resulted in the jury's not having the benefit of the mitigating evidence, evidence which was both relevant and admissible.
Finally, having determined that defendant's counsel at the penalty phase was ineffective, we must still decide whether the deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair, resulting in prejudice to the defendant. Brooks, 94-2438 at p. 9; 661 So.2d at 1339; Lockhart v. Fretwell, 506 U.S. 364, 372, 113 S.Ct. 838, 844, 122 L.Ed.2d 180 (1993). In State ex rel. Busby v. Butler, 538 So.2d 164, 172-73 (La.1988), this court reasoned that if the mitigating circumstances of mental impairment had been established, the degree of likelihood that a jury would not have recommended a death sentence is sufficient to undermine confidence in the outcome of the penalty phase of the trial. Such evidence had the potential to totally change the evidentiary picture by altering the causal relationship which can exist between mental illness and homicidal behavior. Psychiatric mitigating evidence not only can act in mitigation, but it also can significantly weaken the aggravating factors. State ex rel. Busby, 538 So.2d at 172-173. In Sullivan, 596 So.2d at 192, we held that testimony that Sullivan had been previously diagnosed as a schizophrenic, a disease which continued to affect his judgment and his actions, along with evidence of history of abuse as a child and evidence that family members would plead for his life could have altered the outcome at the penalty phase of the trial. In the instant case, counsel failed to investigate and present evidence of defendant's past mental illness for which he had been treated as recently as a few months prior to the offense. Defense counsel did not present to the jury evidence that defendant had been diagnosed with schizophrenia for some years prior to the offense, that defendant had suffered from the same visual and auditory hallucinations that he told authorities about upon his arrest and that defendant had been treated for years with psychotropic drugs. Defense counsel did nothing in the penalty phase except offer the meager testimony he presented at the guilt phase and give a lackluster two paragraph closing argument. Taking all of these factors together, we conclude that the deficient performance of defense counsel rendered the result of the penalty phase unreliable, resulting in prejudice to the defendant. Accordingly, we must set aside defendant's sentence and remand the case to the trial court for a new sentencing hearing.

DECREE
For the reasons assigned, defendant's conviction for first degree murder is affirmed. *35 Defendant's sentence of death is vacated and set aside and the case is remanded to the district court for a new sentencing hearing.
LEMMON, J., subscribes to the opinion and assigns additional reasons.
LEMMON, Justice, subscribing to the opinion and assigning additional reasons.
I agree with the reasoning and result of the majority opinion.
On direct review, claims of ineffective assistance of counsel generally are referred to post-conviction proceedings. On the direct review of a death sentence, however, it is preferable, when there is a substantial allegation of ineffective assistance of counsel in the penalty phase of a capital case, to affirm the conviction and conditionally affirm the sentence, but to remand the case to the trial court for an evidentiary hearing on ineffective assistance of counsel, with the defendant's right reserved to seek review in this court if he or she does not obtain relief in the district court. In this manner, claims of ineffective assistance of counsel can be cleared up on direct appeal in the state courts so that a clean and complete record will be available for subsequent federal review. See, e.g., State v. Fuller, 454 So.2d 119 (La.1984); State v. Strickland, 94-0025 (La.11/1/96); 683 So.2d 218.
In the present case, the record compels the conclusion that trial counsel was ineffective, and the medical evidence submitted in this court[1] establishes that trial counsel's failure to investigate and to present such evidence renders the result unreliable. A new penalty hearing is therefore required, even without the generally preferable remand procedure.
NOTES
[*] Johnson, J. not on panel. Rule IV, Part 2, § 3.
[1] R. Neal Walker of the Loyola Death Penalty Resource Center was appointed as co-counsel on this direct appeal on October 22, 1992.
[2] Assignment of Error No. IV.
[3] At trial, James E. Calhoun, appointed counsel, was defendant's sole attorney. The Rules of our Court now provide, although they did not at the time of this trial, that an indigent capital defendant is entitled to "no less than two attorneys...." La. Supreme Court Rule XXXI (J)(1)(a)(effective July 1, 1994).
[4] This court affirmed Sullivan's conviction but vacated his sentence of death and remanded for a new sentencing hearing. Sullivan petitioned for certiorari. The U.S. Supreme Court held that the constitutionally deficient reasonable doubt instruction required reversal of Sullivan's conviction.
[5] La.Code Crim. P. art. 905.5 provides that the following shall be considered mitigating circumstances:

(e) At the time of the offense the capacity of the offender to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect or intoxication [emphasis added].
[6] Defendant's past history of mental illness was alluded to by the two psychiatrists appointed to the sanity commission who testified for the prosecution. Both Dr. Ware and Dr. Boswell referred to the reports from Texas in their written psychiatric evaluations for the sanity commission. Moreover, Mr. Henry, the district attorney, furnished Dr. Ware with the records from Texas. Therefore, it appears that the prosecution was able to obtain the Texas records prior to trial.
[1] The determinative evidence in the present case was gathered and presented to this court by appellate counsel. Normally, such evidence would be offered at the evidentiary hearing on remand, where the prosecutor can contest the evidence or present rebuttal evidence.