JOHNSON, C.J.,
would grant the application for post-conviction relief and assigns reasons.
|,Michael Wearry was convicted of the brutal first-degree murder of a sixteen-year-old pizza delivery boy and sentenced to death. The murder occurred on April 4, 1998 in Livingston Parish and went unsolved for three years. In his application for post-conviction relief, I find Wearry raises several valid claims with regard to 1) defense counsel rendering ineffective assistance of counsel in the guilt phase and the penalty phase and; 2) whether he is entitled to the protections of Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
Ineffective Assistance of Counsel at the Guilt Phase
Under the standard for ineffective assistance of counsel set forth in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), adopted by this Court in State v. Washington, 491 So.2d 1337, 1339 (La.1986), a reviewing court must reverse a conviction if the defendant establishes (1) that counsel’s performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) counsel’s inadequate performance prejudiced defendant to the extent that the trial was rendered unfair and the verdict suspect.
*621 Defense counsel’s guilt phase strategy consisted entirely of an attempt to undercut the credibility of the state’s witnesses, followed by the presentation of three alibi witnesses. Counsel has acknowledged that at the time of trial he 12believed it was unnecessary to investigate the circumstances of the victim’s death and conceded that he conducted no independent investigation of the evidence, but instead relied solely upon what the state shared. Further, defense counsel conceded he had no strategic basis for his failure to investigate. In a case in which counsel was aware that the only eyewitness to the murder had given several differing accounts before trial, his decision to contest the state’s theory of the case solely by cross-examination fell short of prevailing professional norms. See Strickland, 466 U.S. at 688-689, 104 S.Ct. at 2065; ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, pp. 76-80.
The defendant claims trial counsel should have presented additional witnesses to support his alibi and to contradict the state’s rebuttal to it. At trial, counsel called relator’s girlfriend, Renarda Dominick; her aunt; and her sister; who each testified that relator accompanied them to a wedding reception in Baton Rouge and remained there until 9:00 or 9:30 p.m. on the night of the murder, and that relator did not return to Springfield until between 10:00 and 11:00 p.m. Wearry, 03-3067 at pp. 14-15, 931 So.2d at 309. The defendant claims he would have had to leave Baton Rouge no later than 7:30 p.m. to participate in the murder and asserts that he actually did not leave until 9:00 or 9:30 p.m.
At the post-conviction hearing, relator presented seven additional witnesses who attended the wedding reception and were unrelated to the defendant. Specifically, the additional witnesses were: (1) Ed Helm, the best man at the wedding, who testified that relator and Renarda arrived at the reception between 7:00 and 7:30 p.m., exh. 99, pp. 81-83; (2) Errol Russell, who saw relator at the reception and spoke with Renarda after the dinner and wedding party toasts concluded, and then spoke with her again 30 to 45 minutes later, id. at pp. 146-49; (3) LaTonya Russell, who testified that after an hour or an hour and 30 minutes of dinner and toasts at the start of the reception, Errol Russell left his seat with |sthe wedding party to join her; that thereafter she met relator; and that she and Errol left with the bride and groom around 10:00 p.m., id. at pp. 133-37; (4) Jeff Turner, the DJ at the reception, who testified that he did not close down until between 10:00 and 11:00 p.m. and that when he left the bride and groom were still there, id. at pp. 99-104; (5) Bobbi White, who testified that the reception began around 9:00 or 9:30 p.m. and that about half the guests were still there when she left around 10:00 or 10:30 p.m., id. at pp. 125-27; (6) Madelina Jordan, who testified that relator and Renar-da were not yet at the reception when she arrived; that they later arrived; and that she said goodbye to Renarda and relator who were both still there when she left sometime after dark, id. at pp. 155-57; and (7) Carolyn Helm, who testified that she attended the reception from about 6:00 to 9:00 p.m. and danced with Renarda over the course of a couple of hours. Id. at pp. 91-95.
Courts have “recognized that when trial counsel fails to investigate and present an alibi witness, ‘[t]he difference between the ease that was and the case that should have been is undeniable.’ ” Caldwell v. Lewis, 414 Fed.Appx. 809, 818 (6th Cir.2011) (internal citations omitted). Indeed, it has been held that “[e]yewitness identification evidence[, as this case rested *622 on,]... is precisely the sort of evidence that an alibi defense refutes best.” See Griffin v. Warden, Maryland Corr. Adjustment Ctr., 970 F.2d 1355, 1359 (4th Cir.1992).
Counsel’s alibi investigation was unreasonably limited given its importance to relator’s defense. According to the state’s evidence, the victim left his last pizza delivery around 8:20 p.m. and his body was discovered 70 minutes later, at 9:30 p.m. Weary, 03-3067, pp. 2-3, 931 So.2d at 302. Given the short timeline in the case, any additional evidence which indicated that relator was at a wedding reception nearly an hour’s drive away at any point immediately preceding or overlapping with the 70-minute window in which the abduction and murder took place would have cast doubt on the state’s theory of the case.
14 Given the evidence post-conviction counsel was able to gather several years later, it appears trial counsel could have reasonably done as much or more to establish relator’s alibi. Counsel failed to procure and present additional alibi testimony from anyone else, even though it would have been of measurable benefit to present at least one witness who appeared less biased than the three people with whom relator attended the reception. Cf. Johnson v. Mann, 1993 WL 127954, 1993 U.S. Dist. Lexis 5238 (S.D.N.Y. Apr. 20, 1993) (“As to the alibi issue, counsel made the strategic decision ... [not] to rely on the inherently suspect testimony of family members.”). In my view, counsel’s performance fell far below professional norms because there were unrelated witnesses, easily available, who could have been presented to the jury.
Having established that counsel’s performance fell short of prevailing professional norms, relator must also show prejudice as a result of counsel’s performance. Assuming that some or all of the additional witnesses would have testified at trial as they did at the post-conviction hearing, they would have provided an expanded context for relator’s alibi and generally bolstered the credibility of the three witnesses who were presented. The proffered witnesses would have also contradicted the state’s rebuttal. In the absence of additional support for his alibi, the verdict was rendered upon an incomplete presentation of the evidence that could have been gathered through a reasonable investigation. Counsel’s investigation fell below professional norms and relator was prejudiced as a result.
Ineffective Assistance of Counsel at the Penalty Phase
A defendant at the penalty phase of a capital trial is entitled to the assistance of a reasonably competent attorney acting as a diligent, conscientious advocate for his life. State v. Fuller, 454 So.2d 119, 124 (La.1984); State v. Berry, 430 So.2d 1005, 1007 (La.1983); State v. Myles, 389 So.2d 12, 28 (La.1980) (on reh’g). The role of an attorney at capital sentencing resembles his role at trial in that he must “ensure that the adversarial testing process works to produce a just result....” Burger v. Kemp, 483 U.S. 776, 788-89, 107 S.Ct. 3114, 3122-26, 97 L.Ed.2d 638 (1987).
To show that counsel rendered ineffective assistance at the penalty phase, Wearry must meet the standard set out by this Court in State v. Hamilton, 92-2639, p. 6 (La.7/1/97), 699 So.2d 29, 32, under which it must be shown that counsel failed to undertake “a reasonable investigation [which] would have uncovered mitigating evidence,” and that failing to put on the available mitigating evidence “was not a tactical decision but reflects a failure by counsel to advocate for his client’s cause,” which caused Weary “actual prejudice.” Hamilton, 92-2639 at 6, 699 So.2d at 32 (citing State v. Brooks, 94-2438 *623 (La.10/16/95), 661 So.2d 1333; State v. Sanders, 93-0001 (La.11/30/94), 648 So.2d 1272). This Court has held that:
Ineffective assistance of counsel in the penalty phase of capital cases is a recurring problem. In many cases ... defense counsel, after vigorously contesting the guilt phase, has turned the case over to the jury for penalty determination with little additional evidence or argument, perhaps because the emotional and physical strain on the sole defense counsel in the losing effort in the guilt phase lessens his ability to maintain the same performance level in the immediately following penalty phase.
State v. Williams, 480 So.2d 721, 728, n. 14 (La.1985). The ABA Guidelines provide an instructive overview of the scope of counsel’s duty to investigate at the penalty phase in a capital case and provide that counsel explore, inter alia, the defendant’s: medical history (including hospitalizations, mental and physical illness or injury, alcohol and drug use, pre-natal and birth trauma, malnutrition, developmental delays, and neurological damage); family and social history (including physical, sexual or emotional abuse; history of mental illness, cognitive impairments, substance abuse, or domestic violence; poverty, familial instability, neighborhood environment and peer influence); educational history; and | r,employment and training history. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, pp. 81-82 (2003).
Wearry’s penalty phase consisted of the prosecutor’s opening statement, which indicated the state’s intention to establish aggravating circumstances warranting the death penalty, defense counsel’s opening statement in which he expressed disappointment in the verdict and asked the jury to keep an open mind and make the “just choice;” and defense counsel listing three mitigating factors which may apply:
The mitigating circumstances that you can consider, among them are prior criminal history. There is some. You determine whether it is significant enough to punish in which direction. The youth of the offender at the time. Michael Weary was 20 years old at the time. You make that determination as to whether you think that is a mitigation circumstance in your mind. One of them is the offender was a principal whose participation was relatively minor. Well, again, you have already weighed those facts in the guilt phase and you are the one that knows in your mind what you think, whether it was participation in general or a specific participation, you have made that determination and so keep that in mind as you weigh this. And finally, any other relevant mitigating circumstances and we will be attempting to put on family members and let them tell their story to you, also.
Trial Tr. at pp. 2347-48.
Counsel’s advocacy for Wearry’s life may be classified as subdued, at best. In his opening remark, counsel chose to emphasize three mitigating circumstances, and did so without explaining why Wearry should not receive a death sentence. Counsel failed to elicit any additional mitigating circumstances and failed to argue in closing why the jury should consider anything that was presented to sway it from imposing a death sentence. The evidence that was actually elicited did not constitute the sort of mitigating circumstances that tend to be compelling in a capital case.
Accepting that counsel generally failed to establish any mitigating circumstances, the first inquiry under Hamilton is whether a reasonable investigation would have uncovered any mitigating evidence. See *624 92-2639, p. 6, 699 So.2d at 32. The relevancy threshold for mitigation evidence is extremely low and is satisfied by evidence which ‘“tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value.’ ” Tennard v. Dretke, 542 U.S. 274, 284, 124 S.Ct. 2562, 2570, 159 L.Ed.2d 384 (2004) (quoting McKoy v. North Carolina, 494 U.S. 433, 440-441, 110 S.Ct. 1227, 1232, 108 L.Ed.2d 369 (1990)); La.C.Cr.P. art. 905.5(h). In capital cases, the relevancy standard essentially translates into “whether the evidence is of such a character that it might serve as a basis for a sentence less than death.” Id., 542 U.S. at 285, 124 S.Ct. at 2571 (citation and quotations omitted). Critically, a defendant need not show a nexus or causal relationship between his tormented childhood or disabilities and his crime. Tennard, 542 U.S. at 287-88, 124 S.Ct. at 2571.
In support of the instant application, post-conviction counsel presented evidence that Wearry’s childhood was influenced by abuse, poverty, instability, and neglect. Wearry’s older cousin, Daytra Miller, with whom he spent a good deal of time growing up and sometimes resided, illustrated the circumstances of his childhood. Daytra testified that although there were periods of relative stability, Wearry’s mother regularly beat him severely enough to leave marks and bruises. Daytra testified that Wearry’s teachers sought to place him in special education, but his mother was opposed to special assistance; and that Weary regularly struggled with homework. According to Daytra, the method employed by Wearry’s mother to assist him with homework was to hit and whip him when he failed to give correct answers. Daytra testified that she knew Wearry had often been disciplined at school for bad behavior, but that she and her siblings tried to intercept teachers’ notes to shield Wearry from being beaten as punishment. Corroborative of Daytra’s testimony regarding the physical abuse, when Wearry was sent to live in California at age 12, his father and step-mother observed that he |swas covered in welts and bruises upon arrival. Wearry’s father then discovered that his mother’s new husband, Larry Sibley, had also been beating Wearry.
The district court neglected to address counsel’s penalty phase performance, but rather denied relief because it found the evidence insufficient to establish that Wearry was mentally retarded and therefore insufficient to show a reasonable probability of a different outcome. Upon review of the trial transcript and evidentiary hearing testimony, however, it is evident that a reasonable penalty phase investigation would have uncovered a substantial amount of relevant mitigating evidence, which was not presented to the jury. See Hamilton, 92-2639, p. 6, 699 So.2d at 32; see also Wiggins v. Smith, 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003) (“[Ejvidenee about the defendant’s background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background [or to emotional and mental problems] may be less culpable than defendants who have no such excuse.”) (internal quotation marks omitted); Eddings v. Oklahoma, 455 U.S. 104, 115, 102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) (“[TJhere can be no doubt that evidence of a turbulent family history, of beatings by a harsh father, and of severe emotional disturbance is particularly relevant.”). Post-conviction counsel presented evidence that, in addition to the physical abuse inflicted while in his mother’s custody, Weany has cognitive problems, brain damage, and Fetal Alcohol and Posh-Traumatic Stress Disorders. Such findings would have served as com *625 pelling mitigating evidence. Although counsel consulted with Wearry and interviewed his family, he failed to conduct a meaningful investigation into his mental health and childhood, which may have persuaded jurors to spare his life. See, e.g., Porter v. McCollum, 558 U.S. 30, 41, 130 S.Ct. 447, 454, 175 L.Ed.2d 398 (2009) (finding that evidence of poor mental health or mental impairment, in addition to other mitigating evidence, could influence a jury’s appraisal of ^defendant's moral culpability); see also Penry v. Lynaugh, 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (“[Evidence about defendant’s background and character is relevant because of the belief ... that defendants who commit criminal acts that are attributable to ... emotional or mental problems ... may be less culpable than defendants who have no such excuse.”), abrogated on other grounds by Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).
The second inquiry under Hamilton is whether counsel had a tactical reason for failing to investigate and present mitigating evidence. See 92-2639, p. 6, 699 So.2d at 32. Upon reviewing his penalty phase performance, counsel admitted that he did not conduct any investigation and did not hire a mitigation specialist. He also testified that he had no tactical or strategic reason for these failings, save a perception that the public defender’s limited resources would not permit it. However, lack of funding does not constitute a strategic basis for failing to advocate on a defendant’s behalf, especially in a capital case. See generally Rompilla v. Beard, 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005), (counsel has an independent duty, even in the face of a defendant’s refusal to cooperate or his outright opposition, to delve into the defendant’s background for mitigating evidence that might persuade a jury to spare his life). See generally State v. Sparks, 88-0017 (La.5/11/11), 68 So.3d 435, 484 (“[WJhile the failure to present mitigating evidence at trial can be reasonable if shown to be the result of tactical decision, the failure to investigate the existence of such evidence is ineffective assistance of counsel.”) (citing State ex rel. Busby v. Butler, 538 So.2d 164, 171 (La.1988) (collecting cases)).
Finally, the last inquiry under Hamilton is whether Wearry suffered prejudice as a result of counsel’s deficient performance, or rather, whether the jury would still have found the death penalty warranted if it had heard the mitigating circumstances. See Hamilton, 92-2639, p. 6, 699 So.2d at 32. Because of the relatively superficial evidence presented on Wearry’s behalf at the penalty phase, it is likely the jury was convinced there were no truly mitigating circumstances. Thus, as a result of counsel’s failure to investigate, the jury was left unaware of evidence that Wearry suffered from Fetal Alcohol Spectrum Disorder, Post-Traumatic Stress Disorder, and intellectual and cognitive impairments. Given that jurors “ ‘must be able to consider and give effect to any mitigating evidence relevant to a defendant’s background and character or the circumstances of the crime,” ’ it is reasonable to conclude that Wearry suffered prejudice in the minds of at least some jurors in the absence of the mitigating evidence now presented. See Blystone v. Pennsylvania, 490 U.S. 299, 304-05, 110 S.Ct. 1078, 1082, 108 L.Ed.2d 255 (1990) (quoting Penry, 492 U.S. at 327-28, 109 S.Ct. at 2951). See State v. Ford, 10-1151 (La.2/4/11), 57 So.3d 297; see also State v. Brooks, 94-2438 (La.10/16/95), 661 So.2d 1333, 1339; State v. Sullivan, 596 So.2d 177, 192 (La.1992) rev’d on other grounds, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (finding ineffective assistance at penalty phase in capital case where coun *626 sel failed to present evidence of defendant’s mental impairment, that he was severely abused as a child, and that his mother and sisters loved him; and concluding that evidence of mental illness “has the potential to change totally the eviden-tiary picture by altering the causal relationship which can exist between mental illness and homicidal behavior.” (citing Busby, 538 So.2d at 173)).

Atkins v. Virginia

The defendant claims he is exempt from capital punishment because he is mentally retarded. He argues the trial court erred in finding this claim procedurally barred and in concluding that he failed to show a reasonable probability that the outcome would have been different. Mr. Wearry asserts that the proper test is not whether he has demonstrated that the outcome would have been different if he had J^raised the claim at trial, but rather whether he has shown by a preponderance of the evidence that he is mentally retarded.
The American Association on Intellectual and Developmental Disabilities (AAIDD) and the Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) define mental retardation as significantly subaverage intellectual functioning accompanied by significant limitations in adaptive functioning, originating before the age of 18. Atkins v. Virginia, 536 U.S. 304 at 308 n. 3, 122 S.Ct. 2242, 153 L.Ed.2d 335, (2002). The Court in Atkins embraced these definitions of mental retardation. Id. at 308, 122 S.Ct. 2242. Louisiana, however, has seized upon language in Atkins that permits lower courts and state legislatures to define their own procedural rules to “enforce the constitutional restriction,” as license to apply methods that deviate from and are more restrictive than the accepted scientific and clinical definitions. Atkins’ directive mandates that states may establish procedural rules, but should adhere to the scientific and clinical definitions of mental retardation set forth by the AAIDD and the DSM-IV-TR. Atkins, 536 U.S. 304, 317, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (citing Ford v. Wainwright, 477 U.S. 399, 106 S.Ct. 2595, 91 L.Ed.2d 335 (1986)). The Court gave states authority over the procedures used to implement the categorical exemption, such as whether determinations of mental retardation should be made by a judge or by a jury, whether determinations should occur before or after guilt-innocence trials, which party bears the burden of proof, and what entitles a mental retardation claim to an evi-dentiary hearing or bars it by procedural default. The Court also anticipated case-by-case dispute over the fact-intensive determination of whether a particular defendant has mental retardation. But, the Court did not give states license to narrow the class of persons who fall within the constitutional prohibition. Deviations in how mental retardation is defined can result in exactly what Atkins prohibits: the execution of capital defendants who have mental retardation.
112Under State v. Williams, 01-1650, p. 27 (La.11/01/02), 831 So.2d 835, 857, to establish mental retardation, a defendant must first show that he has significantly sub-average intelligence, as generally measured by standardized IQ tests. Williams, 831 So.2d at 853-54. The Wechsler and Stanford-Binet IQ tests are frequently used to assess intelligence and both utilize a mean score of 100. Id. at p. 23, n. 26, 831 So.2d at 853. The Wechsler scale uses a standard deviation of 15 in assessing whether a score indicates above or below average intelligence. Id. Thus, a person with a score two standard deviations below average would score an IQ of 70 on the Wechsler scale. However, sub- *627 average general intellect, as indicated by an IQ score, is not the sole criterion for determining whether a person is mentally retarded: sub-average intellect must be accompanied by significant deficits in adaptive skills which manifested during the developmental stage. Id.
The defendant’s I.Q scores are 72 and 75. A person is considered mentally retarded within this range if their adaptive functioning is substantially impaired. (Citing DSM-IV at 42.) According to Dr. Shaffer, a clinical and neuropsychologist hired by the defense, defendant’s test results on the Adaptive Behavior Assessment indicate significantly sub-average adaptive functioning. Dr. Shaffer testified that the defendant may have been genetically predisposed to suffer from mental retardation because his mother has an IQ of 65 and one of his sisters was mentally retarded with severe behavioral problems. Dr. Hope administered the Adaptive Behavior Scale to defendant, which shows that defendant suffered from impaired adaptive skills at age 16. The defendant also presented evidence demonstrating academic impairment at or below 6th grade levels, as well as evidence of deficits in daily skills and that his disorders manifested prior to his 22nd birthday. See Williams, 01-1650, p. 24, 831 So.2d at 854. Based on these facts, the defendant has demonstrated that he is not subject to the death penalty pursuant to Atkins.
| iaIn addition, post-conviction counsel presented expert testimony and evidence demonstrating that Wearry had been diagnosed with Fetal Alcohol Spectrum Disorder and, as a result, displayed intellectual and adaptive functioning impairments. Wearry was also diagnosed with Post-Traumatic Stress Disorder, resulting from the ongoing physical abuse which was “so severe that [it] caused [Weary] to fear for his life,” and an incident of sexual assault which occurred when his mother left him unattended. According to Dr. Robert Shaffer, Wearry’s mother drank so excessively that she often wandered off and left her children for several days. On one such occasion, when Weary was seven or eight, he and his siblings were left unsupervised at the home of another person. While there, a group of teenaged boys stripped Wearry of his clothing in the bathroom and assaulted his anus with an alcohol bottle. Wearry’s older brother Cornell testified that he heard Wearry screaming and attempted to rescue him but was prevented by the assailants. Cornell told Dr. Shaffer that, after the incident, Weary was a changed person; much less trusting and avoided bathing whenever possible. According to one of Wearry’s teachers around this time, he began to display exaggerated and startled reactions with little prompting. Further, Dr. Shaffer testified that Weary has cognitive defects, neurological impairment, and is of sub-average intelligence. State-hired psychologist, Dr. Donald Hoppe, agreed that Wearry suffered from cognitive problems, brain damage, abuse, and post-traumatic stress disorder. The testimony presented paints a picture of a young man with an extremely troubled upbringing and sub-average intelligence. In my view, he has sufficiently demonstrated entitlement to the protections afforded by Atkins.