JjMIRIAM G. WALTZER, Judge.
Defendant, Damian Woods, appeals his conviction and sentence for manslaughter.
STATEMENT OF THE CASE
Woods was charged by grand jury indictment on 14 January 1999 with second degree murder, a violation of La. R.S. 14:30.1. Defendant pled not guilty at his 20 January 1999 arraignment. The court denied defendant’s motion to suppress on 19 February 1999. On 3 June 1999 the trial court found defendant competent to proceed. On 6 December 1999 the trial court declared a mistrial after the jury failed to reach a verdict. On 2 February 2000 at the conclusion of a two-day retrial, a twelve-person jury found defendant guilty of manslaughter. The trial court denied defendant’s motion for new trial on 31 May 2000. On 22 September 2000 defendant was sentenced to forty years at hard labor. Defendant filed an oral motion to reconsider sentence and an oral motion for appeal. The trial court directed defense counsel to supplement the motion for appeal by filing a written one. The record contains no written motion to reconsider or for appeal, but it appears that a motion for appeal was granted at some point.
12FACTS
Defendant was charged ^th the second-degree murder of Charles E. Fairley, his stepbrother.
New Orleans Police Officer Jeanine Cruz testified that on the night of 18 November 1998, while working a paid detail at the corner of St. Louis and Royal Streets, she heard two gunshots at St. Louis and Bourbon Streets. As she hurried to that location, she observed defendant walking toward her on St. Louis Street, apparently stuffing a handgun inside of his shirt. When he got close, she confronted him and grabbed at his waist, confirming the presence of a gun. She firmly told him to get down, and he complied. She then removed the gun from his waistband. She identified the gun in court. As the handcuffed defendant was being walked to a police unit, a number of people approached to say that defendant had just shot someone on the corner.
Dr. Richard Tracy, qualified by stipulation as an expert in the field of pathology, performed an autopsy on the victim. He said the cause of death was a single gunshot wound to the left chest, which first passed through the left arm. However, he also said the two wounds, the through-and-through wound to the arm and the one to the chest, could have been from two bullets. The victim was six feet four inches tall, and weighed one hundred and sixty-eight pounds. Dr. Tracy said the fatal shot traveled downward from the head to the feet at a forty-five degree angle. When asked on redirect examination if he knew whether the victim had been completely upright or bent down when he was shot, Dr. Tracy said there was no way to know.
Officer Joseph Tafaro, a criminalist with the New Orleans Police Department Crime Lab, was qualified by stipulation as an *561 expert in serology, hair 13and fiber analysis, and gunpowder residue analysis. He identified his report under an item number, which matched the item number on packages of physical evidence, such as the victim’s clothes, and fingernail and hair samples. He found no evidence of any skin, hair, blood or fibers under the fingernails of the victim. He tested a shirt with bullet holes that was introduced in evidence by the State, and found no gunpowder residue on it. This indicated to him that the bullet or bullets were fired from a distance of more than three to four feet away.
Officer Byron Winbush was qualified by stipulation as an expert in field of ballistics and firearms examination. He examined a Lawson .380 caliber semi-automatic pistol identified by Officer Cruz as the one she seized from defendant, along with two spent cartridge cases submitted with it. Officer Winbush stated that the bullet recovered from the victim and a comparison bullet he fired from the Lawson pistol were fired from the same .380 caliber Lawson pistol. He could not match the spent cartridge casings found at the scene with a comparison casing he obtained by firing the gun. He offered one explanation — the inferior quality of the gun caused different markings on the casings.
Crime Lab Officer James Gahagan collected the two spent cartridge casings at the scene of the shooting, the corner of St. Louis and Bourbon Streets. One was on the sidewalk, the other was about five to eight feet away in the street. He identified the gun he received from Officer Cruz, and detailed the chain of custody. Officer Gahagan conceded on cross-examination that the two spent casings at the scene were twenty-two feet apart.
Homicide Detective Joseph Waguespack investigated the homicide. Defendant was transported from the scene to the homicide office. He was advised of his rights and waived them by so signifying on a rights-of-arrestee form. |4 Defendant’s girlfriend, Marvel “Chichita” Crowder,[1] who defendant said had been at the scene, was taken to the homicide office. Defendant then gave a statement, an audiotape which the state played for the jury. A statement was also taken from Chichita Crowder. After being told that the victim sustained only one gunshot wound, police returned to the scene to search for a “strike mark” indicating where the second bullet fired by defendant might have impacted. Police could find no strike mark anywhere near the scene.
A redacted transcript of defendant’s testimony given at his previous trial was read for the jury.
Kamel Benaouadj, a cab driver, testified that on the night of the crime he was in his cab, parked on St. Louis Street at the corner of Bourbon Street, between Bourbon and Royal Streets. He witnessed the shooting. He observed and heard the victim and a girl using foul language. The victim pushed the girl, and a second man fired twice. Benaouadj replied in the negative when asked whether the victim was trying to attack or kick the shooter. He said the victim was hitting the girl. Be-naouadj could not identify defendant in court as the shooter he could only say with fifty percent certainty that it had been him. However, he identified defendant at the scene, to Officer Cruz. On cross-examination, Benaouadj stated in broken English that defendant “check like this before he could use the gun.... ” He conceded *562 that everything he observed was seen over his taxicab.
It was stipulated that if the State were to call chemist Angela Comstadt as a witness she would testify that she analyzed the blood, bowel and urine of the victim, and found no trace of alcohol or commonly abused drugs.
I ¿ERRORS PATENT
A review of the record reveals no errors patent.

ASSIGNMENT OF ERROR NO. 1

In his first assignment of error, defendant complains that his trial counsel was ineffective in failing to take adequate steps to ensure that Marvel “Chichita” Crowder testified at the second trial. Chichita Crowder, whom defendant referred to in the presence of police as his girlfriend, was with him at the time of the shooting. She testified at his first trial, where a mistrial was declared after the jury was unable to reach a verdict.
“As a general rule, claims of ineffective assistance of counsel are more properly raised by application for post conviction relief in the trial court where a full evidentiary hearing may be conducted if warranted.” State v. Howard, 98-0064, p. 15 (La.4/23/99), 751 So.2d 783, 802. However, where the record is sufficient, the claims may be addressed on appeal. State v. Wessinger, 98-1234, p. 43 (La.5/28/99), 736 So.2d 162, 183; State v. Bordes, 98-0086, p. 7 (La.App. 4 Cir. 6/16/99), 738 So.2d 143, 147. Ineffective assistance of counsel claims are reviewed under the two-part test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1333, 1337 (on rehearing); State v. Robinson, 98-1606, p. 10 (La.App. 4 Cir. 8/11/99), 744 So.2d 119, 126. In order to prevail, the defendant must show both that: (1) counsel’s performance was deficient; and (2) he was prejudiced by the deficiency. State v. Jackson, 97-2220, p. 8 (La.App. 4 Cir. 5/12/99), 733 So.2d 736, 741. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by | ¿the Sixth Amendment. Strickland, 466 U.S. at 686, 104 S.Ct. at 2064; State v. Ash, p. 9 (La.App. 4 Cir. 2/10/99), 729 So.2d 664, 669. Counsel’s deficient performance will have prejudiced the defendant if he shows that the errors were so serious as to deprive him of a fair trial. To carry his burden, the defendant must show that there is a reasonable probability that, but for counsel’s deficient performance the result of the proceeding would have been different; “[a] reasonable probability is a probability sufficient to undermine confidence in the outcome.” Strickland, 466 U.S. at 693, 104 S.Ct. at 2068; State v. Guy, 97-1387, p. 7 (La.App. 4 Cir. 5/19/99), 737 So.2d 231, 236.
This court has previously recognized that if an alleged error falls “within the ambit of trial strategy” it does not “establish ineffective assistance of counsel.” State v. Bordes, 98-0086, p. 8, 738 So.2d at 147, quoting State v. Bienemy, 483 So.2d 1105, 1107 (La.App. 4 Cir.1986). Moreover, as “opinions may differ on the advisability of a tactic, hindsight is not the proper perspective for judging the competence of counsel’s trial decisions. Neither may an attorney’s level of representation be determined by whether a particular strategy is successful.” Id. quoting State v. Brooks, 505 So.2d 714, 724 (La.1987).
In the instant case, defendant stated during a pre-trial colloquy with the court on the first day of trial that his witness Chichita had been in court. The court noted that Chichita had been in the courtroom during jury selection. Defendant said he had Chichita’s number and *563 that she could be paged. The court advised defendant that it would do anything it needed to do to assist him in getting his witnesses to court. After the State rested, defense counsel announced to the jury that defendant would not testify. Counsel said the only evidence she would present was some |7clothes offered under a stipulation that they were the clothes defendant was wearing on the night he was arrested.
After the jury retired to deliberate, the trial court noted for the record, “for appellate purposes,” that Chichita Crowder was in court the previous day, during jury selection. The court further noted that Chi-chita Crowder knew that the trial was proceeding forward and that a jury was being selected. The only witness listed on defendant’s witness work sheet was someone from the coroner’s office. The record does not reflect that defense counsel wished to call any witnesses, including anyone who was unavailable. Furthermore, Chichita Crowder testified at the motion for a new trial, and mentioned nothing about why she did not testify at the second trial.
Chichita Crowder testified at the first trial that she had dated the victim for almost nine years, and had lived with him at least part of that time. They had broken up approximately one year prior to the night the victim was killed. Her testimony was somewhat confusing as to the sequence of events on the night in question. Crowder initially testified that she was working at a French Quarter club, “La Pads Orgy,” when defendant, who she said met her every night when she got off work, entered. She said defendant informed her that the victim, Charles Fair-ley, was on his way there, and that the victim was really upset. However, Crow-der’s subsequent testimony was that the victim showed up before defendant got there. She attempted to get into a cab, but the victim would not let her close the door. She returned to La Paris Orgy club, where she waited for defendant to arrive. She claimed that the victim entered the club at some point. Crowder characterized the victim as being in a rage. She said he was uncontrollable and like a monster. He loudly cursed her. She walked out the side door of the club | sonto Bourbon Street. The victim followed, pushing her up against a wall and threatening her. He ordered her not to talk to anyone, told her that she was not to see anyone, and that he would kill anyone that was close to her. She also said he had threatened to kill her while they were inside of the club.
At some point after defendant arrived, she and defendant started walking toward the corner of Bourbon and St. Louis Streets. Defendant got lost in the crowd. The victim hit her, dazing her. Asked what happened next, Crowder said, “I think” defendant tried to break it up, telling the victim not to hit her. She said defendant went “across” her. She saw the gun. She said “we all reached for the gun.” Two shots were fired, and the victim fell. She claimed that she did not see who the shooter was. She said the gun had been purchased by her. It had been misplaced when she moved, and she lost track of it. When asked whether defendant typically carried a handgun in the French Quarter, Crowder replied that he was not permitted to carry a gun because he was on probation, and that she had never known him to carry a gun there.
It can be noted that in defendant’s testimony at his first trial, a redacted version of which was read to the jury, he said that the victim initially had the gun. Defendant claimed that he grabbed it from the victim and placed it in his waistband. He claimed that when the victim attempted to retrieve the gun, defendant removed it from his waistband and fired a shot at the *564 ground. He said the victim charged him and he fell back onto a Lucky Dog stand, discharging the fatal shot. Defendant testified that the gun went off by accident, that he was not claiming self-defense. Defendant’s testimony at his first trial otherwise was similar to that of Chichita Crow-der — the victim “blew a gasket” and was acting crazy, threatening him, and beating Chichita and threatening to kill her. Defendant |aadmitted while testifying at the first trial that he told Det. Waguespack that he shot the victim in self-defense, not accidentally.
Defendant’s claim of error is that trial counsel rendered ineffective assistance “by failing to take adequate steps to insure the presence of Marvel ‘Chiquita’ [sic] Crow-der to testify at the second trial.” This claim implies that trial counsel wished to call her but was unable to locate her. However, the record reflects that trial counsel made no attempt to call Chichita Crowder as a witness. This obviously was a tactical decision by trial counsel. As this matter falls under the ambit of trial strategy, it does not constitute ineffective assistance of counsel.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 2

In his second assignment of error, defendant claims the trial court erred in denying his motion for a new trial, based on newly discovered evidence the testimony of Tyrone Williams.
In order to obtain a new trial based on newly discovered evidence, the defendant must show: (1) the new evidence was discovered after trial; (2) the failure to discover the evidence at the time of trial was not due to the defendant’s lack of diligence; (3) the evidence is material to the issues at trial; and (4) the evidence is of such a nature that it would probably have changed the verdict of guilty. La. C.Cr.P. art. 851(3); State v. Brisban, 2000-3437, p. 12 (La.2/26/02), 809 So.2d 923, 931. A trial court assessing the legal merits of a motion for new trial is given considerable latitude in evaluating the reliability of the evidence and its impact on the verdict. State v. Brooks, 98-0693, p. 12 (La.App. 4 Cir. 7/21/99), 758 So.2d 814, 821. The trial court has much discretion in ruling on a motion for new trial. State v. Cureaux, 98-0097, p. 4 (La.App. 4 Cir. 5/26/99), 736 So.2d 318, ┴10321. Review of the trial court’s ruling is limited to determining whether the trial court abused its discretion. State v. Labran, 97-2614, p. 6 (La.App. 4 Cir. 5/26/99), 737 So.2d 903,-907.
Tyronne Williams, a new witness presented by defendant at the hearing on the motion for new trial, testified that he was employed as a bouncer by a club, “Silver Frolics,” located at 427 Bourbon Street. He was an eyewitness to the shooting. He was leaving his place of employment when he noticed the victim and Chichita Crow-der standing on the corner arguing. Williams knew the victim, who was a musician. When asked if he knew the victim was an expert in martial arts, Williams replied that he had heard the victim talk about “it.” He said the victim kept grabbing Chichita, while she was telling him to leave her alone. Williams did not notice defendant until defendant turned to the victim and implored him to leave Chichita alone, to just “let it go.” The victim became enraged and told defendant to get out of his face, saying that he had nothing to do with the situation. The victim turned on Chichita again, and she tried to walk off. The victim grabbed her and spun her around. Defendant intervened again, and Williams then saw defendant go “flying,” landing on the sidewalk next to Chris Owens’ Club. Williams did not see defendant pull a gun, but heard two gun *565 shots, very close together. He said a Lucky Dog stand was between them when he heard the gunshots. Williams said he had not talked to anyone about what he witnessed.
Williams said on cross-examination that defendant walked up St. Louis Street after the shooting. He saw defendant being apprehended two doors down. He recalled a female officer coming back toward the corner with defendant, carrying a gun she said defendant had been tucking into his pants. Williams said |T1the Lucky Dog stand had been on the side of Chris Owens’ Club, but that it was moved when the ambulance arrived.
Chichita Crowder also testified at the hearing on the motion for new trial. She said it was her gun that was used in the shooting. She said police did not interview the Lucky Dog man who was a witness to the crime.
-The trial court found nothing new or enlightening in the testimony of either Tyrone Williams or Chichita Crowder, and denied the motion for new trial. Defendant argues that the trial court’s reasons indicated that it resolved the issue on the last factor — that if the evidence had been introduced at the trial it probably would not have changed the verdict.
Although the trial court did not address this issue, the record reflects that defendant did not establish that the failure to identify Williams as a witness at the time of trial was not. due to his lack of diligence. While the record does not indicate how Williams ultimately was identified as a witness, at the time of the May 2001 hearing on the motion for new trial he was still working at the same Bourbon Street club where he was working on the night of the shooting. The club was located very near the intersection of St. Louis and Bourbon Streets. Thus, Williams had always been available. Accordingly, the motion for new
trial was properly denied for this reason alone. See State v. Ventry, 99-0302, p. 6 (La.App. 4 Cir. 6/14/00), 765 So.2d 1129, 1133, writ denied, 2000-2113 (La.9/28/01), 797 So.2d 683 (no merit to claim that trial court erred in denying motion for hew trial where defendant failed to establish that evidence was discovered only after trial and that his failure to discover the evidence was not due to a lack of reasonable diligence on his part).
haAs to whether Williams’ testimony probably would have changed the verdict, defendant argues that this evidence was crucial to his case because it supported his claim that he was attacked by the victim before any shots were fired. He also submits that in this respect Williams’ testimony impeaches the testimony of the State’s only eyewitness, Benaouadj.
Benaouadj, who testified in halting and somewhat broken English, replied in the negative when asked if the victim had been trying to attack defendant or kick him, stating that the victim was hitting Chichi-ta. Benaouadj also answered in the negative when asked whether he had seen defendant fall.
Defendant further .argues that Tyrone Williams’ testimony supported his claim that the victim was a “martial arts expert,” and that this would have aided his self-defense claim. When asked whether he knew that the victim was a martial arts expert, Williams’ said that he had heard the victim talk about it. He also said that the victim did something that caused defendant to go flying and land on the sidewalk. Defendant testified at his first trial that the victim charged at him and kicked him, causing him to fall back onto the Lucky Dog stand, whereupon the gun accidentally discharged.
Finally, defendant submits that if the victim was in a karate kicking stance, hav *566 ing just kicked defendant, this would account for the downward path of the bullet. However, there was no expert testimony to this effect.
Defendant is correct that Williams’ testimony does support important .aspects of his testimony given at the first trial, and contradicts critical testimony by the State’s only eyewitness, Benaouadj. However, Williams’ testimony can also be viewed as contradicting defendant’s testimony in several respects. Williams said the gunshots were very close together, while defendant testified that he first JLyfired a shot into the ground when the victim allegedly attempted to take the gun from him, and the second shot was not fired until he fell back onto the Lucky Dog stand after the victim kicked him.
In addition, Williams said nothing about seeing defendant initially take the gun away from the victim. Defendant’s testimony was that the victim pulled the gun out of his pants. Defendant grabbed it from him, put it in his waistband, and pushed the victim out of the way. The victim kept trying to get the gun back, so defendant pulled the gun out and fired a shot into the ground. Williams’ testimony essentially contradicted this testimony by defendant, as Williams said he had not seen defendant until defendant intervened in the confrontation between the victim and Chichita. Williams said that when defendant intervened, the victim verbally lashed out at defendant, then turned and grabbed Chichita. Williams testified that defendant then intervened, and the victim did something that resulted in defendant flying and landing on the sidewalk, after which two shots were fired.
Defendant argues that had Williams been allowed to testify, the jury would probably have believed defendant’s claim that he was acting in self-defense, whether or not it was inclined to believe that the shooting was accidental.
La. R.S. 14:20(1) sets forth the general self-defense rule that would be applicable in the instant case, providing that a homicide is justifiable when committed by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm, and that the killing is necessary to save himself from that danger. Defendant makes only a conclusory self-defense argument. The trial court was correct that Williams’ testimony added nothing new, although it both supported defendant’s testimony and contradicted it. It cannot be said that the trial court abused its discretion in denying the motion for a new trial.
1¡¿There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NO. 3

In his last assignment of error, defendant argues that the trial court erred in overruling defendant’s objection to the State’s reading of what he claims was an unredacted version of defendant’s testimony from his first trial, containing references to what he characterizes as prior convictions.
The State introduced the transcript of defendant’s testimony from his first trial under the authority of State v. Reed, 324 So.2d 373 (La.1975). In Reed, the Louisiana Supreme Court recognized the “longstanding federal rule” that a defendant in a criminal case who takes the stand in his own behalf and testifies without asserting his privilege against self-incrimination thereby waives the privilege as to the testimony given so that it may be used against him in a subsequent trial of the same case. 324 So.2d at 380, citing Harrison v. United States, 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); see also State v. Graves, 96-1537, p. 10 (La.App. 4 Cir. 9/10/97), 699 So.2d 903, 908 (citing *567 Reed). In addition to the argument concerning his privilege against self-incrimination, the defendant in Reed also argued that the introduction of his testimony from his first trial violated La. C.Cr.P. art. 857, which provides that one effect of the granting of a new trial is to “permit retrial of the case with as little prejudice to either party as if it had never been tried.” The court in Reed rejected that latter argument, concluding that a defendant who takes the stand in his own defense is not protected by La.C.Cr.P. art. 857 when the State, at a subsequent trial, seeks to introduce that testimony to the jury, provided the State “does not make it apparent,to the jury that the testimony was from a prior trial.” 324 So.2d at 381.
In the instant case, copies of a redacted transcript of the defendant’s testimony at his first trial were prepared for the jury, and a prosecutor unconnected with the case read it to the jury. The trial court noted on the first day of trial that the redacted transcript contained some references to objections. Defense counsel asked if the references could be blacked out, but the record reflects that the court reporter was to excise those lines before the transcript was read for and presented to the jury the following day. Defense counsel made no other objections to the redacted transcript. After closing arguments, before the jury was instructed, defense counsel objected that the redacted transcript contained three references to the word “jail.” The prosecutor argued that under the jurisprudence any part of the transcript containing references to pri- or convictions was admissible. The trial court stated that Reed clearly said that prior convictions and allusions thereto were admissible in introducing the prior testimony of the defendant.
Reed does not specifically address the issue of prior convictions. However, the only limitation Reed placed on the introduction of a defendant’s prior trial testimony at a subsequent trial was that the State could not make it apparent that the testimony was from a previous trial. Under Reed, the prior trial testimony is admissible because the defendant waived his Fifth Amendment privilege against self-incrimination when he testified at the previous trial. When defendant waived his privilege against self-incrimination and testified at that previous trial, it was with the understanding that he could be examined as to his prior convictions. The defendant’s admissions of prior convictions are part and parcel of his testimony from the previous trial, which is admissible at the subsequent trial.
Defendant cites State v. Bishop, 98-1147 (La.App. 3 Cir. 2/3/99), 734 So.2d 674. In Bishop, the- defendant argued on appeal that the trial court had erred in [ ¶ (¡denying his motions for mistrial and new trial based on the State’s introduction of testimony from his previous trial in which the defendant had admitted that he suffered from cocaine addiction and had committed a burglary. Defendant in the instant case erroneously'represents that the appellate court in Bishop resolved the issue on the ground that “any error that occurred in this regard would be harmless.” The court in Bishop found harmless error as to any error with regard to the jury being exposed to the fact that the defendant was being retried. However, as to the defendant’s motion for mistrial based upon inadmissible evidence of other crimes, the court found that because such evidence was admissible at the first trial, it was properly revealed to the jury in the second trial during the publishing of defendant's testimony from the first trial. As to the defendant’s motion for a new trial, the court in Bishop court found no abuse of discretion in the court’s apparent denial of *568 the motion because, in part, the testimony from the first trial was admissible in toto.
The court’s holding in Reed is entirely consistent with the proposition that a defendant’s admission of prior convictions while testifying at a previous trial are admissible as part and parcel of his testimony in a subsequent trial. Bishop does not contradict this view.
There is no merit to this assignment of error.

CONCLUSION

For the foregoing reasons, defendant’s conviction and sentence are affirmed.
AFFIRMED.
PLOTKIN, J., DISSENTS WITH WRITTEN REASONS.

. The record refers to Crowder’s nickname as "Chichita.” Appellate counsel refers to it as "Chiquita.”