I,MURRAY, Judge.
Leroy Wilson appeals his conviction for the second degree murder of Eric Johnson. We affirm for the reasons that follow.
Facts and Trial Testimony
Shortly after 7:00 p.m. on Friday, February 10, 1995, seventeen-year-old Eric Johnson and fifteen-year-old Jessica Stra-han were walking to a neighborhood park in the Gentilly area of New Orleans. After passing two young men standing by a driveway, they noticed that the men kept looking at them. Mr. Johnson asked Ms. Strahan if she knew them, but she said no.
When the couple had reached the edge of the park, one of the men approached them while the other remained behind. Mr. Johnson asked him, “What you coming over here for, Dog?” When the man responded with, “What you asking me?” Mr. Johnson repeated his question. The individual then lifted his shirt to reveal a gun, causing Mr. Johnson and Ms. Strahan to look at each other in shock. Suddenly, the man pulled the gun and began firing at Mr. Johnson. After the first shot, the person who had remained in the background started running, but Ms. Strahan was too shocked to run until a second shot was fired.
|2Several patrol officers of the New Orleans Police Department, in the area on another call, rushed to the scene after hearing five or six gunshots. Mr. Johnson was lying in the street at the corner of Treasure and Piety Streets, bleeding from gunshot wounds in his head, chest and left thigh. Although an EMS team arrived quickly, he was pronounced dead at the scene. An autopsy revealed that either the shot to the head or to the chest would have been fatal. No alcohol or illegal drugs were found in Mr. Johnson’s tissues or organs.
Ms. Strahan, who had run to her nearby home to call the police, returned to the scene and told Officer Derek Frick she had been with Mr. Johnson when he was shot. According to Officer Frick’s initial report, Ms. Strahan described both the perpetrator and his companion as black males, about 5’7” tall and under twenty years old; one man was wearing a brown or black flannel shirt, while the other wore a black jacket and a black cap.[1] At trial, Officer Frick testified that a suspect matching the description of the gunman was arrested about two blocks away later that evening.[2]
Shortly after his arrival at the intersection, Homicide Detective Norman Pierce was informed that Ms. Strahan was an eyewitness to the shooting. He briefly interviewed her, then, after completing his on-scene investigation, took Ms. Strahan to the police station for a formal, audiotaped statement. However, her description of the perpetrator as a black male, between 5’3” and 5’7” and wearing a dark shirt, was too general to lead to a suspect, so Det. Pierce continued his investigation in the ensuing weeks.
b-jOn direct examination, Det. Pierce testified that it was just over a month after the killing that he presented a photographic lineup to Ms. Strahan. Without any prompting, suggestion or inducement from the officer, she pointed to the picture of Leroy Wilson, the defendant, as the person who shot and killed her boyfriend, Eric *225 Johnson. Ms. Strahan signed the back of that photo and initialed the other ñve.
During cross examination, Det. Pierce reiterated that the information Ms. Stra-han provided the night of the killing was insufficient for him to compile a lineup, and that the murder weapon was never recovered. Defense counsel then questioned him as follows:
Q: Do you recall about how many of these potential witnesses there were during your investigation that gave you names of potential suspects?
A: Yes, ma'am, there were three altogether counting Ms. Strahan.
Q: Three. And did any of these — none of these people, though, gave you physical descriptions? Is that correct?
A: Only Ms. Strahan on the night of the incident.
It was then brought out that the clothing worn by the perpetrator was never found, and, through one of the photographs taken the night of the shooting, that “it was fairly dark” at the scene, but the police “could still see” the area.
Before beginning redirect, the prosecutor asked for a bench conference, which was not recorded or transcribed. Det. Pierce was then questioned by the State as follows:
Q: Detective, during the course of your investigation in this matter, and you were asked during cross examination how you developed Mr. Wilson as a suspect.
A: Yes, ma'am.
14Q: And, in addition to obtaining a physical description, how else did Mr. Wilson become a suspect?
A: We received a name through communications that night where we received a phone call of [sic] a young male who said that Leroy was the one who did the shooting.
Q: Okay. And were you able to speak with that witness?
A: Yes I was.
Q: And was that witness able to provide you with a name?
A: Yes, ma'am, a full name. He knew Mr. Wilson.
Det. Pierce further testified that both the unnamed witness referred to above and someone named “Kayelle Tony” selected Mr. Wilson’s picture from the same photo array shown to Ms. Strahan.[3]
As redirect continued, Det. Pierce explained that the police communications are recorded and transcribed for each case, and he identified a computer printout of messages concerning this crime as the “complaint history” for this case. This one-page document, subsequently admitted into evidence without a defense objection, includes the following entries:
1921 SUPP 156,,, WILLIE 7 Y/O, [address & phone #], COMP STATES LEROY SHOT SOMEONE IN THE PARK // NDG,NF 1
[[Image here]]
1941 SUPP 158,,, MALE/RELAYD,,, LEROY B/M,„ DRK BLUE JACKET, WHITE SHIRT,, DRKPANTS,,,, #2 5’,,, HAT, LIGHT COMPLEXION,,, WHITE SHIRT,, K 1941 SUPP 158,,, AKAI PANTS,,,, MILTON,,,,, COMPL STATES POLICE HAVE WRONG PERSON,,,
There was no further testimony regarding this document other than Det. Pierce’s *226 | (¡explanation that “1910” indicated the initial call was received at 7:10 p.m..
Redirect was concluded when Det. Pierce reiterated that the warrant for Mr. Wilson’s arrest was based upon three identifications. On recross, defense counsel asked if the two people, other than Ms. Strahan, who named Mr. Wilson as the shooter knew him before “this incident.” Det. Pierce responded affirmatively.
Jessica Strahan was the final witness to testify at the June 1997 trial. As she explained the events leading up to the murder, she described the shooter as dark-complected, slim, and a little taller than herself.[4] Ms. Strahan testified that she had no doubt in her mind that Leroy Wilson, the man sitting in the courtroom before her, was the person who killed Eric Johnson.
On cross, Ms. Strahan stated that she had seen Mr. Wilson in the neighborhood and at her school before the shooting, but she had never met him. Ms. Strahan insisted that when she was questioned at the police station she told Det. Pierce she had seen the gunman before, but she admitted she had not said this during the initial on-scene interview. Some time later, but before the photo lineup, Ms. Strahan’s cousin told her Leroy Wilson was the man who had killed Eric Johnson. However, while neither her cousin nor anyone else was nearby when the shooting occurred, Ms. Strahan stated there were other people some distance away in the park at the time of the shooting.
After consideration of this testimony and the evidence, including Officer Frick’s report that was offered by the defense, the twelve-person jury found Mr. Wilson guilty of second degree murder. He was sentenced in July 1997 to the mandatory term of life imprisonment without benefit of probation, parole or | ^suspension of sentence. This out-of-time appeal was granted in 1998.
DlSCÜSSION
Although asserted in various forms in several assignments of error, Mr. Wilson’s primary challenge to his conviction-rests upon the admission of Det. Pierce’s testimony that two other individuals had named him as the perpetrator and later selected his picture from a photo lineup, as well as the admission of the “complaint history” containing the references to “Leroy” as the killer. Mr. Wilson contends that both the testimony and the document constituted inadmissible hearsay, and because these out-of-court identifications improperly bolstered the only evidence against him, i.e., Ms. Strahan’s testimony, this error cannot be considered harmless. As appellate counsel recognizes, however, the issue of the admissibility of this evidence has not been preserved for appellate review because no objection was recorded during trial. La.Code Crim. Proc. art. 841 A; State v. Wessinger, 98-1234, p. 16 (La.5/28/99), 736 So.2d 162, 178, cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999). Therefore, Mr. Wilson contends that he is entitled to a new trial because the failure to lodge a contemporaneous objection constituted ineffective assistance of counsel.
The State does not dispute that the evidence regarding identifications by two non-testifying witnesses was hearsay, but argues instead that the testimony and the document were admissible because defense counsel “opened the door” during her cross examination of Det. Pierce. The State further contends that any error in the admission of the hearsay was harmless because Ms. Strahan’s credibility was not challenged and because the jury was told that she was the only eyewitness to the shooting. The State thus maintains that Mr. Wilson was not prejudiced by trial counsel’s failure to object to either Det. *227 Pierce’s testimony or the admission of the 1 /‘complaint history.”
To support a claim for ineffective assistance of counsel, a defendant must show that counsel’s performance was deficient and that he was prejudiced by the deficiency. Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); State v. Brooks, 94-2438, p. 6 (La.10/16/95), 661 So.2d 1338, 1337 (on rehearing). The defendant must prove both elements to establish that his attorney was so ineffective as to require reversal. State v. Hongo, 96-2060, p. 5 (La.12/2/97), 706 So.2d 419, 422. Counsel’s performance is ineffective when it is shown that he made errors so serious that counsel was not functioning as the “counsel” guaranteed by the Sixth Amendment. Strickland at 686, 104 S.Ct. at 2064.
To carry his burden of proof on this claim, a defendant “must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.” Id. at 693, 104 S.Ct. at 2068. However, if an alleged error results from a reasonable strategic decision, counsel’s performance will not be considered deficient on that basis. State v. Brooks, 505 So.2d 714, 724 (La.), cert. denied, 484 U.S. 947, 108 S.Ct. 337, 98 L.Ed.2d 363 (1987).
Generally, the issue of ineffective assistance of counsel is a matter more properly addressed in an application for post-conviction relief, filed in the trial court where a full evidentiary hearing can be conducted. State v. Prudholm, 446 So.2d 729, 737 (La.1984); State v. Hampton, 94-1943, p. 9 (La.App. 4th Cir.12/27/96), 686 So.2d 1021, 1026, writ denied, 97-0166 (La.6/13/97), 695 So.2d 986. Only if the record discloses sufficient evidence to rule on the merits of the claim do the interests of judicial economy justify consideration of the issue on [^appeal. State v. Seiss, 428 So.2d 444, 449 (La.1983).
In the instant case, it is clear that Mr. Wilson’s attorney was the first to question Det. Pierce regarding information received from sources other than Ms. Strahan. However, considering the extent of the information ultimately admitted as a result of defense counsel’s relatively narrow inquiry, we are unable to determine whether this was inadvertent or was part of a trial strategy intended only to highlight some inadequacy in the investigation or, perhaps, some inconsistencies in the anticipated testimony of other witnesses.[5] Moreover, given the absence of any physical evidence linking Mr. Wilson to this crime, we are unable to conclude that the admission of the evidence at issue was harmless beyond a reasonable doubt under Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Although Ms. Strahan answered affirmatively when questioned about the certainty of her identification, her responses on both direct and cross examination seem halting and hesitant, and she seemed to have become easily confused by fairly straightforward questions. While her appearance on the stand could have created a different impression to those present in the courtroom, the cold transcript of her testimony, taken as a whole, is not so compelling as to convince this court beyond a reasonable doubt that the jury did not rely on the hearsay evidence in determining Mr. Wilson’s guilt.
For these reasons, we find the present record insufficient for a ruling on the merits of Mr. Wilson’s claim of ineffective assistance based upon counsel’s failure to object to hearsay evidence. This issue is, therefore, preserved for consideration in post-conviction proceedings.
*228 |flMr. Wilson has also assigned errors relating to the fact that there were three off-the-record bench conferences during trial. Appellate counsel argues that if a defense objection was urged during the conference that preceded the State’s redirect of Det. Pierce, then the trial attorney was 'ineffective in failing to ensure that a complete record was made of all proceedings, as required by Article 843 of the Code of Criminal Procedure. He further contends that because the substance of these bench conferences could be relevant to this court’s review of the merits of his appeal, the failure to record and transcribe the discussions represents a violation of his right to judicial review under Article I, Section 19 of the state Constitution.
When a transcript is so defective that errors in the trial proceedings cannot be reviewed because of the incomplete record, then a defendant’s right to full appellate review has been compromised, and a reversal is mandated. State v. Landry, 97-0499 (La.6/29/99), 751 So.2d 214, and cases cited therein. If, however, the record contains all evidentiary portions of the trial, and there is no objection noted relative to the non-evidentiary portions, reversal is not required because the appellant is not denied the right to a full review of the evidence. State v. Thomas, 92-1428, pp. 2-8 (La.App. 4th Cir.5/26/94), 637 So.2d 1272, 1274, writ denied, 94-1725 (La.11/18/94), 646 So.2d 376, cert. denied, 514 U.S. 1054, 115 S.Ct. 1437, 131 L.Ed.2d 317 (1995).
As to off-the record bench conferences, the Supreme Court recently stated:
This court has never articulated a per se rule either requiring the recording of bench conferences or exempting them from the scope of La.Code Crim. Proc. art. 843. Still, art. 843’s description of “objections” and “arguments” will normally apply only to objections made in open court and the arguments of counsel in closing, because only these objections and arguments rise to a level of materiality sufficient to invoke art. 843. Similarly, Art. I, § 19’s command to record “evidence” does not encompass bench conferences, at least, not ones that do not satisfy the materiality requirements of La.Code [inCrim. Proc. art. 843.
State v. Hoffman, 98-3118, p. 49 (La.4/11/00), 768 So.2d 542, 586 (citations and footnote omitted), cert. denied, — U.S. -, 121 S.Ct. 345, 148 L.Ed.2d 277 (2000).
In the instant case, Mr. Wilson does not claim any prejudice resulting from two of the unrecorded bench conferences. Therefore, the failure to record and transcribe them does not impinge on Mr. Wilson’s right to judicial review. State v. Hoffman, supra; see also State v. Mamon, 26,337, pp. 7-8 (La.App.2d Cir.12/16/94), 648 So.2d 1347, 1354, writ denied, 95-0220 (La.6/2/95), 654 So.2d 1104. Assuming that the third concerned the admissibility of Det. Pierce’s testimony regarding other identifications, it is not the failure to record the conference that may have prejudiced the defendant, but his counsel’s failure to note an objection for the record when the discussion was completed. Therefore, Mr. Wilson is not entitled to a new trial based upon the failure to record and transcribe the three bench conferences.
Mr. Wilson next asserts that his trial attorney was ineffective because, although she made two oral motions for new trial and an oral motion for appeal, she failed to file any written post-trial motions. However, Mr. Wilson has been granted an appeal, and he has not specified any grounds upon which a motion for new trial should have been granted. Accordingly, he has not established any prejudice resulting from counsel’s failure to file written motions.
In his final assignment of error, Mr. Wilson argues that the trial court’s failure to advise him, as required by Criminal Procedure article 930.8, that he has only two years after his conviction *229 becomes final in which to petition for post-conviction relief is a patent error. However, the language in Article 930.8 C is 1 ^merely precatory and does not bestow an enforceable right upon an individual defendant. State ex rel. Glover v. State, 93-2330, pp. 20-21 (La.9/5/95), 660 So.2d 1189, 1201. Accordingly, this failure is not an error and requires no action on the part of this court. State v. Guy, 95-0899, p. 15 (La.App. 4th Cir.1/31/96), 669 So.2d 517, 526-27, writ denied, 96-0388 (La.9/13/96), 679 So.2d 102.
Errors Patent
A review of the record for errors patent indicates that there were none. As noted above, however, there were two oral motions for new trial urged by defense counsel, but neither was ruled upon. Generally, a motion for new trial must be disposed of before sentencing and, if overruled, the imposition of sentence must be delayed. La.Code Crim. Proc. arts. 853, 873; State v. Lambert, 98-0730, p. 8 (La.App. 4th Cir.11/17/99), 749 So.2d 739, 748. However, because no written motion was filed and there was no statement of the grounds upon which the motions were urged, as required by Criminal Procedure article 852, neither the failure to rule on the motion nor the failure to delay sentencing constitutes an error patent.
Conclusion
For the reasons assigned, Mr. Wilson’s conviction and sentence are affirmed, but his claim of ineffective assistance of counsel based upon the admission of hearsay evidence is preserved for post-conviction review.
AFFIRMED.

. The report estimates one suspect’s age as 16-19 years and the other's as 16; no weight or other identifying information is shown.

. While it appears that this suspect was not the defendant and that this individual was quickly released, the record contains no information about him other than this passing mention at trial.

. While the name in the transcript is spelled phonetically, the record indicates that the other person identifying defendant as the shooter was Kylo Toney. Mr. Toney testified at an earlier suppression hearing, but M. Wilson's appellate counsel did not designate the transcript of that testimony to be included in the record on appeal. In addition, while Mr. Toney was personally served to appear and testify at trial, he was not called as a witness; the record does not indicate whether he failed to appear for trial or was released from his subpoena.

. Ms. Strahan said she was now “five-five or five-six,” but had grown "maybe about an inch” since 1995.

. As previously noted, it appears Kylo Toney, one of the people who phoned to say "Leroy” was the perpetrator, may have been expected to testify at trial. Thus, consideration of his testimony at the suppression hearing may be relevant to a determination of this question.