STEVEN R. TATE

VERSUS

STATE OF LOUISIANA

NO. 24-KH-636

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

*Wiseman*

Linda Wiseman
First Deputy, Clerk of Court

January 29, 2025

Linda Wiseman
First Deputy Clerk

**IN RE** STEVEN R. TATE

**APPLYING FOR** SUPERVISORY WRIT FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT, PARISH OF JEFFERSON, STATE OF LOUISIANA, DIRECTED TO THE HONORABLE JACQUELINE F. MALONEY, DIVISION "D", NUMBER 16-7077

Panel composed of Judges Susan M. Chehardy,
Fredericka Homberg Wicker, and Timothy S. Marcel

**WRIT DENIED**

Relator, Steven R. Tate, seeks supervisory review of the trial court's judgment denying his application for post-conviction relief (APCR). For the reasons that follow, relator's writ application is denied.

*Facts and Procedural History*

On August 10, 2022, a jury found relator guilty of second-degree murder. On August 29, 2022, the trial court sentenced relator to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. This Court affirmed relator's conviction and sentence. *State v. Tate*, 22-570 (La. App. 5 Cir. 6/21/23), 368 So.3d 236. Relator did not file a writ application with the Louisiana Supreme Court.

On February 8, 2024, relator filed his APCR in the trial court asserting ineffective assistance of counsel. On July 31, 2024, relator filed a supplement to his APCR that included additional claims of counsel's ineffectiveness. On August

24-KH-636

6, 2024, the trial court ordered the State to file its procedural objections. In its response, the State argued that relator's claims were without merit. On November 21, 2024, the trial court denied relief, finding relator had not "presented sufficient evidence of any of these claims, and thus has not met his burden," citing La. C.Cr.P. art. 930.2.[1] On November 25, 2024, relator filed a pleading captioned as a rebuttal to the State's response, re-urging his claim of counsel's ineffectiveness. On December 5, 2024, the trial court denied relator's pleading, stating: "Nothing in petitioner's present pleading affects or changes the court's [November 21, 2024] ruling denying relief." Relator timely filed a writ application within thirty days from the district court's November 21, 2024 ruling from which he seeks review.[2]

*Analysis*

The following facts are provided from this Court's opinion in *State v. Tate*, 22-570 (La. App. 5 Cir. 6/21/23), 368 So.3d 236, 239-44:

> On November 29, 2016, Mr. Tate and his childhood friend L.L. were together at L.L.'s grandmother's house playing video games. L.L.'s grandmother and his two teenage-sisters, A.L. and T.L., were also present in the home that day. Mr. Tate considered L.L. and his younger sisters like family. While playing video games, a decision was made to purchase marijuana from Ethan Allen ("Mr. Allen"), a local drug dealer and the victim in this case. Text messages presented at trial demonstrated that Mr. Allen and A.L. had a dealer and customer relationship based on the purchase of drugs. A text message sent from A.L.'s phone was sent requesting a "$10 bag" from Mr. Allen. Mr. Allen was given an address to meet, which was located across the street from L.L.'s grandmother's house. Mr. Tate, testifying in his own defense, admitted that he also texted Mr. Allen the same meeting address.
>
> When Mr. Allen arrived at the agreed upon location, Mr. Tate and L.L. approached Mr. Allen's vehicle. Mr. Tate testified that he did not contact Mr. Allen about the purchase of marijuana. Mr. Tate

---

[1] La. C.Cr.P. art. 930.2 states: "The petitioner in an application for post-conviction relief shall have the burden of proving that relief should be granted."

[2] Relator's writ application does not include a copy of the trial court's November 21, 2024 judgment because relator states that he never received this ruling. Indeed, the trial court record indicates that the judgment was served on the wrong address. Relator also did not file a notice of intent to seek writs due to his failure to receive the trial court's judgment. Consequently, relator's writ application does not include a return date, as required by Uniform Rules – Courts of Appeal, Rule 4-3. Nevertheless, relator's writ application was filed within 30 days of the trial court's judgment.

explained that it was not his intent to purchase drugs from Mr. Allen, but instead to talk to Mr. Allen about the "relationship" Mr. Allen had with L.L.'s younger sister, A.L. Mr. Tate testified that he did not know Mr. Allen but knew that he was an adult and that Mr. Allen was "messing with [A.L.]," whom Mr. Tate stated was 14 or 15 at the time. …

Mr. Tate testified that when Mr. Allen arrived, he (Mr. Tate) was already outside with L.L., waiting on someone to pick him up. Mr. Tate admitted that at that time, he was armed with a .45 caliber Springfield Armory gun in his waistband and that L.L. also had a gun. Mr. Tate explained that when Mr. Allen pulled up to the curb, he walked to Mr. Allen's car, opened the passenger door, and stood in the doorway.

According to Mr. Tate, Mr. Allen tried to hand him money, but he told him, "Just hold it. I just want to talk to you right quick." Mr. Tate asked if he was A.L.'s boyfriend, and Mr. Allen stated that he was not. Mr. Tate questioned why Mr. Allen would be bringing her money, and Mr. Allen asked why he was interested in knowing. Mr. Tate told the jury that he explained to Mr. Allen that he was "like a big brother to [A.L.] and she's only 15," and that he hoped they were not having sex. Mr. Tate indicated that the previously calm interaction grew heated.

Mr. Tate testified that he then told Mr. Allen, "[D]on't put up on her no more [sic] and she don't need no [sic] money from you." According to Mr. Tate, Mr. Allen replied, "What, you gonna [sic] stop me" and pulled out a gun and placed it in his lap, facing towards Mr. Tate. Mr. Tate told the jury that he then began backing up and reaching for his own gun. Mr. Tate testified that Mr. Allen fired two shots, and Mr. Tate realized that he had been shot and began returning fire. Mr. Tate testified that he fired two shots and then he was shot again. Mr. Tate testified that he was shot six times and that it felt like Mr. Allen was trying to kill him. Mr. Tate stated that he then ran under the carport and threw his gun in the grass. He then told L.L. to call the police and an ambulance before passing out.

Mr. Tate denied setting Mr. Allen up for a robbery and stated there was no drug transaction. Mr. Tate admitted that he shot and killed Mr. Allen, but said he did so in self-defense.

Kremly Marrero testified at trial that on November 29, 2016, he lived at 803 Gulf Drive. At around 6:00 or 6:30 p.m., he and his wife heard gunshots. He described it as two shots followed by a slight pause and then an array of shots. Mr. Marrero testified that he walked outside at the same time as his neighbor, who lived at 801 Gulf Drive. Mr. Marrero testified that he saw a vehicle "coasting" down towards the end of the street. Mr. Marrero stated that he saw Mr. Tate under the carport where L.L. and his grandmother lived. L.L. was screaming hysterically, and Mr. Marrero went to help Mr. Tate, whom Mr. Marrero described as "bleeding out everywhere." Mr. Marrero assisted Mr. Tate until the police and EMS arrived.

Officer Boudreaux testified, upon inspecting the vehicle, they located a projectile in the driver's seat, three casings in the rear of the vehicle, and one casing outside the vehicle. … Officer Boudreaux saw no marijuana, other drugs, or any drug paraphernalia in the vehicle. Mr. Allen's vehicle was seized pursuant to a search warrant and seven cartridge casings, two projectiles, and .40 caliber Smith and Wesson firearm were recovered from inside the vehicle.

Officer Kevin Fernandez, a crime scene technician with the Gretna Police Department, testified that Mr. Allen's vehicle was processed and described the projectile damage inside the car. He testified that the vehicle had a hole from a projectile in the front passenger door as well as holes from projectiles on the roof of the vehicle. Two bullet holes were found in the rain guard, which the officer explained is the plastic shield that goes over the car window. Officer Fernandez stated there was also damage to the interior car door from another projectile.

Officer Damond Bartlett responded to the scene at 812 Gulf Drive. Upon his arrival, he observed … Mr. Tate lying on the ground suffering from multiple gunshot wounds to the torso. He located shell casing projectiles in front of the residence and observed shattered glass on the street. … Officer Bartlett testified that he did not find marijuana or drug paraphernalia while canvassing the scene.

Officer Fernandez also testified that … a loaded 9 millimeter caliber Sig Sauer pistol was recovered from the top of a shed. A .45 caliber Springfield Armory pistol was recovered in the backyard. Both firearms were seized.

***

Dr. Dana Troxclair, a forensic pathologist, with the Jefferson Parish Coroner's Office, conducted an autopsy of Mr. Allen. She testified that she found a gunshot wound to the back of Mr. Allen's armpit and an exit wound to his left upper back. Dr. Troxclair testified that the entry wound was consistent with Mr. Allen's arm not being fully stretched out. Dr. Troxclair testified that Mr. Allen bled out as a result of the gunshot wound.

***

Dr. Tim Scanlan, a crime scene reconstructionist, testified that three .45 caliber fired cartridge casings were recovered, which matched a .45 caliber Springfield weapon. Dr. Scanlan testified that he was present when Mr. Allen's vehicle was processed and analyzed pursuant to a search warrant. He stated that two projectiles and seven casings were recovered from the interior of Mr. Allen's vehicle, and one casing was recovered outside the vehicle under Mr. Allen's body. Dr. Scanlan testified that on inspection, Mr. Allen's vehicle had five bullet holes and one bullet strike mark. He explained that based on the holes and markings, he was able to determine that one of the bullet holes that went through the car door evidenced that the door was open at the time the shot was fired. Additionally, Dr. Scanlan testified that

he determined that two bullet holes found in the ceiling showed metal pointing in the direction of travel, "buckling outward" and therefore was evidence that the shots originated from inside the car. He further stated that the angle of fire was going upward from the passenger side to the driver's side of the vehicle. From this information, Dr. Scanlan testified that he concluded that based on the trajectory of the shots, they originated from the front driver's seat area. He explained that "the angle of fire would be upward straight through the roof." Additionally, Dr. Scanlan testified that two other shots originated from inside the vehicle based on the bullet holes. Dr. Scanlan also explained that a bullet strike showed that there was another bullet fired from inside the vehicle "facing back toward that...front driver's seat and striking" before "falling down and coming to rest." Moreover, Dr. Scanlan testified that a projectile that came to rest in the front passenger-side door had been fired from the .40 caliber Smith and Wesson firearm recovered from the rear passenger floorboard of the vehicle.

Dr. Scanlan testified that the ballistic evidence was consistent with an individual standing outside Mr. Allen's vehicle and firing into the open door. He described the evidence as consistent with "focused fire" and showed a stationary shooter. By comparison, Dr. Scanlan testified that the weapon fired by the driver of the vehicle was "sporadic unfocused fire" as evidenced by the strike mark, the broken window, bullet holes in the rain guard, and bullet holes in the ceiling. He agreed that the evidence was consistent with the shooter of the .45 caliber Springfield Armory shooting two focused shots into the vehicle, and then Mr. Allen returning fire in a "sporadic fashion." He further indicated that it "makes sense" for a wounded Mr. Allen to drop the .40 caliber Smith and Wesson on the rear floorboard. He testified that the trajectory put the "shooter [outside the vehicle]," close to the vehicle or a couple feet away.

The State also presented the following other crimes evidence at trial. In April 2015, Detective Jean Lincoln and Sergeant Justin Remes with the Jefferson Parish Sheriff's Office were involved in an investigation regarding the shooting of Rogelio Polledo at the Belle Meade apartment complex. Both indicated that it was an attempted armed robbery.

Sergeant Remes explained that the victim sustained a gunshot wound to the leg while inside his vehicle. The victim was transported to the hospital prior to Detective Lincoln's arrival. Upon Detective Lincoln's arrival on the scene, he observed a bloody passenger seat with three bullet holes in it. Two bullet casings were found inside the vehicle, and one was found outside the vehicle. Marijuana with blood on it was also located inside the vehicle.

The victim identified the suspect from a photographic lineup. An arrest warrant for Mr. Tate for attempted armed robbery and shooting was obtained, and Mr. Tate was subsequently arrested. While initially the victim had been cooperative with the investigation, after his cell phone was held for processing, the victim became uncooperative.

Detective Lincoln agreed that it is very common for "victims of drug rips" to be uncooperative. The case surrounding the April 2015 incident was ultimately dismissed due to the victim's refusal to cooperate in the prosecution of the matter. At trial, Mr. Tate acknowledged that he had been arrested and charged with attempted robbery in 2015 and that the case had been dismissed. Mr. Tate denied knowing anyone named "Rogelio or Roger Polledo" or being involved in an attempted robbery involving a shooting in Belle Meade in 2015. Mr. Tate further testified that he was prepared to go to trial in that case and prove his innocence.

Relator makes several allegations of counsel's ineffectiveness at trial. Specifically, relator contends that counsel failed to: (1) adequately cross-examine Dr. Scanlan; (2) prevent the admission of relator's prior bad acts; (3) call a witness who would have bolstered relator's claim of self-defense; (4) consult with a crime scene expert; (5) effectively cross-examine Mr. Marrero; and (6) move for a mistrial based on the admission of other crimes evidence.

Under the Sixth Amendment to the United States Constitution and Article I, § 13 of the Louisiana Constitution, a defendant is entitled to effective assistance of counsel. *State v. Casimer*, 12-678 (La. App. 5 Cir. 3/13/13), 113 So.3d 1129, 1141. To prove ineffective assistance of counsel, a defendant must satisfy the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *Casimer*, 113 So.3d at 1141. Under the *Strickland* test, the defendant must show: (1) counsel's performance was deficient, that is, that the performance fell below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced the defense. *Id.* An error is considered prejudicial if it was so serious as to deprive the defendant of a fair trial, or "a trial whose result is reliable." *Id.* To prove prejudice, the defendant must demonstrate that, but for counsel's unprofessional conduct, the outcome of the trial would have been different. *Id.* (citing *Strickland v. Washington*, *supra*).

6

First, relator complains that counsel's cross-examination of Dr. Scanlan, the State's expert in crime scene reconstruction, was inadequate. As relator points out, counsel limited his cross-examination of Dr. Scanlan to a question regarding the distance of the shooter from the vehicle and the trajectory of the shots fired. In response, Dr. Scanlan testified that the shooter could have been "close to the car or a couple of feet away." While relator asserts that counsel should have challenged Dr. Scanlan's conclusions about "focused" gunfire versus "sporadic unfocused" gunfire, relator provides no grounds for countering the expert's opinion. *See* La. C.Cr.P. art. 930.2. Furthermore, counsel's choices of which questions to ask on cross-examination fall well within the ambit of trial strategy. *See State v. Brooks*, 94-2438 (La. 10/16/95), 661 So.2d 1333, 1337. Counsel may have avoided questioning the witness on this subject so as not to draw further attention to Dr. Scanlan's opinion that the ballistics evidence showed the shots fired at the victim's vehicle were focused, while the victim fired his weapon "sporadically." We cannot say counsel's cross-examination of Dr. Scanlan fell below an objective standard of reasonableness.

Next, relator faults counsel for failing to "sufficiently represent" him against the State's use of prior bad acts. However, as we noted in relator's appeal, counsel objected to the State's notice of intent to use other crimes evidence concerning relator's 2015 arrest for attempted armed robbery and aggravated battery. *Tate*, 368 So.3d at 248. "[D]efense counsel argued that the incidents were factually dissimilar and that there were no facts to suggest that the instant case involving Mr. Allen was an intended 'drug deal gone bad,'" and that "because the 2015 matter was dismissed, there was no corroborating evidence to support the inference that Mr. Tate was the assailant in the April 2015 incident." *Id.* Thus, contrary to relator's claim, counsel did attempt to prevent the introduction of other crimes evidence, albeit unsuccessfully, and properly preserved the issue for appeal. On appeal, this

Court found no abuse of the trial court's discretion when admitting evidence of the 2015 incident and relator's arrest for attempted armed robbery and aggravated battery. *Id.* at 249. This Court reasoned:

> Even if this Court were to find that the other crimes evidence was improperly admitted, which we do not, the error is harmless. As previously discussed, Mr. Tate testified that he shot Mr. Allen, who died as a result. While Mr. Tate asserted that the shooting was in self-defense, the jury found otherwise. The evidence indicates that Mr. Tate texted Mr. Allen where to meet him, and Mr. Tate approached Mr. Allen with a gun on his person. The testimony and evidence supported a finding that defendant fired his gun first and that Mr. Allen fired back after he was shot. Additionally, the trial judge provided the jury with an instruction on the limited purpose for which it could consider the other crimes evidence. Therefore, the verdict was surely unattributable to admission of the evidence related to the April 2015 incident.

*Id.* In short, counsel's actions did not fall short with regard to other crimes evidence.

Relator also faults counsel for failing to call Alizah Dryant as a witness. According to relator, Ms. Dryant informed the police that she heard "multiple" gunshots. The decision to call or not to call a particular witness is a matter of trial strategy and not, *per se*, evidence of ineffective assistance of counsel. *State v. Allen*, 06-778 (La. App. 5 Cir. 4/24/07), 955 So.2d 742, 751, *writ denied sub nom. State ex rel. Allen v. State*, 08-2432 (La. 1/30/09), 999 So.2d 754. Although relator claims that Ms. Dryant was interviewed "at least twice by Gretna police on December 3, 2016," relator does not provide either a copy of her statements to police or any identifying information other than her name. Additionally, as the trial court indicated, relator failed to include an affidavit from Ms. Dryant to support his claim, and thus, relator failed to meet his burden of proof.

Similarly, relator's contention that a crime scene expert would have bolstered his self-defense claim appears speculative at best. *See* La. C.Cr.P. art. 930.2; *see also Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir. 2009) ("[T]o prevail on an ineffective assistance claim based on counsel's failure to call a

witness, the petitioner must name the witness, demonstrate that the witness was available to testify and would have done so, set out the content of the witness's proposed testimony, and show that the testimony would have been favorable to a particular defense.").

Next, relator contends counsel's cross-examination of Mr. Marrero regarding the sound of the gunshots failed to expose discrepancies between his interview with police and his trial testimony. In support, relator includes a transcribed copy of Mr. Marrero's interview in which he described the first two shots as sounding as if they were fired from a small firearm, like a .22 or 9-millimeter gun, whereas the next round of shots sounded as though they had been fired from a more "powerful" weapon.

According to relator, counsel should have cross-examined Mr. Marrero to point out that relator's firearm, a .45 caliber Springfield Armory gun, could never be mistaken for "something small," thereby lending support to the defense's claim that the victim fired first.[3] Nevertheless, relator also claims that Mr. Marrero's interview states that he and his wife speculated that the second round of gunfire could have been fired by two weapons. Although counsel did not ask Mr. Marrero about this observation, counsel's choices of which questions to ask on cross-examination fall well within the ambit of trial strategy, as discussed above. *See Brooks*, *supra*. Here, counsel's cross-examination revealed that Mr. Marrero was not an eyewitness to the shooting and was not a firearms expert, in an apparent effort to discredit the witness. Consequently, it does not appear that counsel's cross-examination was deficient.

Relator further asserts that counsel failed to impeach Mr. Marrero with evidence that the witness had outstanding attachments, which may have influenced

---

[3] The victim's gun was identified as a .40 caliber Smith and Wesson pistol, which relator alleges is "slightly larger" than a 9-millimeter.

9

him to provide favorable testimony for the State. According to the trial transcript, before Mr. Marrero's testimony, the prosecutor informed the trial court and the defense that the witness had "open traffic attachments" and "two attachments out of Commissioner's Court." The prosecutor further stated that one attachment from Commissioner's Court had been recalled, and the other attachment was still active, but a letter indicated that the "charges were refused." However, under La. C.E. art. 609.1, only criminal convictions can be used to attack credibility, not matters where there has been an arrest, an arrest warrant issued, an indictment, a prosecution, or an acquittal.[4] Thus, Mr. Marrero's outstanding attachments do not qualify as impeachment evidence that counsel could have used on cross-examination.

Finally, regarding the allegation that counsel failed to request a mistrial after other-crimes evidence was introduced—as seen above, counsel did object to the introduction of other crimes evidence, an issue addressed in relator's appeal. As such, relator is hard-pressed to show that the trial court would have granted a mistrial if counsel had requested it. *See State v. Williams*, 613 So.2d 252, 256-57 (La. 1992) ("When the substantive issue that an attorney has not raised has no merit, then the claim that the attorney was ineffective for failing to raise the issue also has no merit.").

In sum, relator has not overcome the presumption that, under the circumstances, counsel's actions "might be considered strong trial strategy." *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 164, 100 L.Ed.2d 83 (1955)). As such, relator has failed

---

[4] Despite the general rule, the possibility that the prosecution may have leverage over a witness due to that witness' pending criminal charges is recognized as a valid area of cross-examination. *State v. Wiley*, 10-811 (La. App. 5 Cir. 4/26/11), 68 So.3d 583, 592, *writ denied sub nom. State ex rel. Wiley v. State*, 11-1263 (La. 3/30/12); 85 So.3d 106. Here, while relator alleges that Mr. Marrero had a "powerful incentive to testify favorably for the State," relator has not shown that the witness received favorable treatment with regard to the outstanding attachments. *See* La. C.Cr.P. art. 930.2.

to demonstrate that counsel's alleged errors rendered his trial "fundamentally unfair." *Strickland*, 466 U.S. at 700, 104 S.Ct. at 2071. Accordingly, relator's writ application is denied.

Gretna, Louisiana, this 29th day of January, 2025.

**SMC**
**FHW**
**TSM**

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



**FIFTH CIRCUIT**

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF DISPOSITION CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE DISPOSITION IN THE FOREGOING MATTER HAS BEEN
TRANSMITTED IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 4-6** THIS
DAY <u>01/29/2025</u> TO THE TRIAL JUDGE, THE TRIAL COURT CLERK OF COURT, AND AT LEAST ONE OF
THE COUNSEL OF RECORD FOR EACH PARTY, AND TO EACH PARTY NOT REPRESENTED BY
COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

**24-KH-636**

#### E-NOTIFIED
24th Judicial District Court (Clerk)
Honorable Jacqueline F. Maloney (DISTRICT JUDGE)
Thomas J. Butler (Respondent)

#### MAILED
Steven R. Tate #771937 (Relator)
David Wade Correctional Center
670 Bell Hill Road
Homer, LA 71040